1  LAW OFFICE OF WILLIAM J. HEALY
   WILLIAM J. HEALY, #146158
2  748 Holbrook Pl.
   Sunnyvale, CA 94087
3  Telephone: (408) 373-4680
   Email: wjhealy7@gmail.com
4
   ATTORNEYS FOR
5  Steven Bernaz and Christine Lee

6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                         (San Jose Division)

11  In re:                          )
                                    )  Case No. 23-50629
12  Lilly Hue Vu,                   )
                                    )  CHAPTER 11
13            Debtor.               )
                                    )
14                                  )
                                    )
15                                  )
                                    )  **Adv. Proc. Case No.**
16  ——————————————————————————)
    Steven Bernaz and Christine Lee, )
17                                  )
              Plaintiffs,           )
18                                  )
         v.                         )
19                                  )
    Lilly Hue Vu,                   )
20                                  )
              Defendant.            )
21                                  )
                                    )
22                                  )
                                    )
23  ——————————————————————————)

24     **COMPLAINT FOR DETERMINATION OF NON- DISCHARGEABILITY OF DEBT**
25      **PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), 523 (a)(4), AND 523(a)(6)**

26         Creditors Steven Bernaz and Christine Lee (jointly "Plaintiffs"), plaintiffs herein, allege as
27  follows:

28  //

Case: 23-05030   Doc# 1   Filed: 09/08/23   Entered: 09/08/23 10:10:30   Page 1 of 61

# I. PARTIES

1.      Plaintiffs are individuals and reside in the City of San Jose, County of Santa Clara, and State of California.

2.      Defendant Lilly Hue Vu ("Debtor", "Defendant", and/or "Vu"), also known as Lilly Vu, is the debtor in the above captioned bankruptcy case ("Bankruptcy Case") and is believed to reside in the City of San Jose, County of Santa Clara, and State of California.

## II. JURISDICTION AND VENUE

3.      This adversary proceeding arises under title 11, or arises in or is related to the Bankruptcy Case, within the meaning of 28 U.S.C. § 1334(b). This Court therefore has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b), 1334(b) and 1334(e) and Rule 5011-1 of the Bankruptcy Local Rules of the United States District Court for the Northern District of California, including jurisdiction to enter a final judgment.

4.      This is an adversary proceeding to determine the dischargeability of debts owed by the Debtor to the Plaintiffs Bank and therefore is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I), (J), and (O). To the extent necessary, Plaintiffs consent to entry of a final judgment by this Court.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

6.      Defendant is subject to the jurisdiction of this Court due to, among other things, her voluntary bankruptcy filing in this Court in the Bankruptcy Case.

## III. GENERAL FACTUAL ALLEGATIONS

7.      Defendant commenced this Bankruptcy Case on June 14, 2023 (the "Petition Date") by filing a voluntary petition under chapter 11 of the Bankruptcy Code. Creditors are listed as general unsecured creditors in Defendant's Schedule E/F (See Part 2, Section 4.11 (Doc#3, page 16 of 25)). The Notice of Chapter 11 Bankruptcy Case (Doc.#12) established the deadline for creditors to file actions under 11 U.S.C. 523 and 727 as September 11, 2023.

8.      The Notice of Chapter 11 Bankruptcy Case (Doc.#12) also indicated a deadline for creditors to file a Proof of Claim, specifically indicating "If your claim is not scheduled or if your claim is designated as disputed, contingent, or unliquidated, you must file a proof of claim or you

might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled." Creditors Debtor's Schedule E/F does not list Creditors' claim as contingent, unliquidated, or disputed and in fact lists it as "Arbitration award Case No. 1110025733" (See Part 2, Section 4.11 (Doc#3, page 16 of 25)). On July 11, 2023 Plaintiffs filed a Proof of Claim ("Claim 1-1").

9.      On June 9, 2022, in JAMS Arbitration Case Reference No. 1110025733 entitled Steven Bernaz and Christine Lee as Claimant and Lilly Vu as Respondent ("Arbitration") the arbitrator, Hon. Kevin E. McKenney (Ret.), issued a Final Award. A true and correct copy of the Final Award is attached hereto and incorporated herein as Exhibit A.

10.      The Final Award, inter alia, found in favor of Plaintiffs and against Defendant in the amount of $1,393,676.21, consisting of $990,713.11 in damages and $402,962.21 in interest, and attorneys' fees, and costs (at that time daily interest on the damages was $189.99 (7%)).

11.      On April 26, 2023, the Santa Clara County Superior Court, in a matter entitled Steven Bernaz and Christine Lee as Petitioners v. Lilly Vu as Respondent, Santa Clara County Superior Court Case No. 19CV358517 ("State Court Action"), issued an Order Confirming Contractual Arbitration Award and Entry of Judgment In Conformity Therewith ("Judgment"). Said Judgment (1) confirms the Final Award; (2) entered judgment in the amount of $1,394,496.85, and (3) awarded Plaintiffs additional attorneys' fees of $750.00 and costs of $71.64. A true and correct copy of the Judgment is attached hereto and incorporated herein as Exhibit B. The Judgment bears statutory interest at 10% per annum pursuant to California Code of Civil Procedure 685.010 (a). The Judgment is final.

12.      As of the Petition Date the Final Award in the Arbitration and the Judgment in the State Court Action had not been paid or satisfied, in whole or in part and, except for the commencement of the Bankruptcy Case, is not subject to a stay.

13.      The Final Award, inter alia, noted on August 16, 2021 each side submitted pre-hearing briefs, exhibits were admitted into evidence, Phase I of the arbitration took place on August 24-27, September 7-8, 24, and October 7, 2021, additional exhibits were admitted into evidence during the hearing, the following witnesses testified during the hearing: Respondent Lilly

Vu, John Quoc Ly, Wilfredo Escobar, Angelina Escobar, Edward Milestone, Steven Spears, Patrick Shires, David Matthews, Dan Dyckman, Jeff Beam, Bruce Matheson, Rocky Rieger, Victoria Naidorf, and Claimant Steven Bernaz, on December 20, 2021 counsel made closing arguments, on February 18, 2022 the Interim Award was completed and signed by the Arbitrator, due to non-payment of administrative fees[1], the Interim Award was not issued to the parties until April 29, 2022, in the Interim Award the Arbitrator found in favor of Claimants and against Respondent and found Claimants to be the prevailing party in the arbitration, the Interim Award permitted Claimants to file a motion for attorneys' fees and costs (and Respondent to oppose the motion) pursuant to the schedule set forth therein, on May 16, 2022 Claimants filed a motion for reasonable attorneys' fees, costs and interest on the amounts awarded, on May 26, 2022 counsel for Respondent advised Claimants' counsel and the Arbitrator that Respondent would not be filing an opposition to the motion, and as such, the matter was deemed submitted for decision on May 26, 2022.

14.     The Final Award found, inter alia:

(a) Respondent concealed a number of material facts affecting the value or desirability of the Property from Claimants in connection with their purchase of the Property. In connection with her purchase of the Property, Respondent received (and initialed) documents (the listing agent's "Agent Detail Report" and AVID) stating that: (1) the home needs updates to "all major systems" and "has visible structural issues;" (2) the "walls, floors, windows, doors, ceilings and other surfaces have . . . cracks, . . . stains and other imperfections in places; (3) the wall in the living room "has major holes and what appears to be visible structural movement within;" (4) "Home appears to have visible structural issues to walls in the living room and front exterior staircase;" and (5) "all major systems of the home, including but not limited to . . . foundation, are in need of repairs or updating." She also received an AVID from her own agent stating that: (1) there were "cracks and stains on floors, walls, . . . and ceiling" in the dining room, kitchen, stairs, bedrooms, and both bathrooms; (2) there was a crack in the floor in the entry; (3) the three bedrooms and non-master bathroom had "Gaps in corners on walls and floor;" (4) "Deck off family room and kitchen slopes down and into property and shows signs of water intrusion;" (5) for the garage, "Large cracks and uneven flooring," "Ceiling has large

[1] Two month delay "Due to non-payment of administrative fees" means delay caused by Respondent Lilly Vu's non-payment of administrative fees.

holes and missing sheetrock," and "Stairs have loose treads and rot next to wall;" and (6) concerning the exterior of the Property, "Stairs show signs of movement with uneven concrete, cracks," and "a brick decorative column is lifted." These statements clearly suggest that the Property had foundation issues and was moving and that this movement was causing visible structural issues that needed repair (cracks, gaps, uneven floors, and water intrusion). The statements would have affected the value or desirability of the Property if disclosed by Respondent, and were, therefore, material facts. (Final Award, pages 24-25);

(b) While Respondent claims to have been unaware of the material facts in these statements (because she purportedly did not read the documents), the evidence established that Respondent either knew or must have known of these facts. Respondent visited the Property before her purchase and received the documents containing the statements in connection with her purchase of the Property. In an email to her agent noting her receipt of the disclosure reports, prior to her purchase of the Property, Respondent stated that she was "aware of the problems with the house." After her purchase, Respondent visited the Property at least 20 times. During her deposition, she repeatedly denied seeing or having any knowledge of cracks and other issues at the Property. At the hearing, she ultimately admitted seeing some of the issues noted in the documents at the site prior to her sale of the Property. When she listed the Property for sale, Respondent was still in possession of the documents containing the material facts, yet she failed to acknowledge that fact in her disclosures, and subsequently failed to produce the documents in response to Claimants' request therefore during the arbitration. Given the foregoing, Respondent undoubtedly knew about material facts (i.e., statements that the Property had visible structural issues and cracks throughout the home) (final Award, page 25);

(c) In addition to her knowledge of these material facts, Respondent also knew that these facts were not known to, or within the reach of the diligent attention and observation of Claimants. The repair work to the Property during Respondent's ownership covered up the problems with the Property. Given the repair work performed, and Respondent's failure to disclose the documents containing the material facts and the photos (available when she purchased the Property) showing the material facts, Respondent deprived Claimants of the ability to see and investigate the problems

1  identified by de Vries and Milestone. Based upon the foregoing, Respondent was under a duty to

2  disclose to Claimants the material statements (regarding cracks and visible structural problems) in

3  the Agent Detail Report and the AVIDs (Final Award, pages 25-26);

4       (d) The evidence was undisputed, and Respondent essentially conceded that she failed to

5  disclose the material facts in the documents (and failed to disclose the documents as required by the

6  SPQ) prior to her sale of the Property to Claimants. The evidence also established that Respondent

7  made misrepresentations in her disclosures to Claimant. Respondent falsely stated in the TDS that

8  she was unaware of alterations or repairs without necessary permits. Respondent falsely stated in the

9  SPQ that: (1) there were no alterations, modifications, improvements, remodeling, or material repairs

10 to the Property; (2) she was not aware of any settling from any cause, or slippage, sliding or other

11 soil problems; (3) she was not aware of any alterations, modifications, (4) while she stated that she

12 was aware of replacements, improvements, remodeling or material repairs on the Property for the

13 purpose of energy or water efficiency and explained that these improvements were painting, new

14 landscape and new driveway, she failed to mention any of the crack and gap covering in the interior

15 of the home; and (5) perhaps most critically, she stated that she was unaware of "reports, inspections,

16 disclosures, . . . maintenance recommendations, . . . or other documents pertaining to . . . the

17 condition or repair of the Property or any improvement on this Property in the past, now or

18 proposed." Nonetheless, after the commencement of the arbitration, Respondent testified that there

19 was nothing she would change in her disclosure reports (Final Award, page 26);

20      (e) While Respondent claims that she had no intention to conceal any information from

21 Claimants or misrepresent certain facts, the evidence was to the contrary. Respondent had knowledge

22 of cracks throughout the Property, "visible structural issues," "visible structural movement," and a

23 foundation in need of repairs or update at the Property. While Respondent covered up the visible

24 problems at the Property, she failed to address the underlying problems and ultimately failed to

25 disclose these facts in connection with her sale of the Property to Claimants. Given her knowledge of

26 the problems at the Property, her decision not to conduct a further investigation because she liked the

27 Property, and her instructions to her husband regarding necessary repairs (i.e., make it "pretty"),

28 Respondent's statement that she relied upon her husband to inspect the home and do what needed to

be done is not credible. She knew her husband's limited relevant experience in connection with the identified problems. The evidence instead indicates that Respondent relied upon her husband to cover up the visible issues at the Property. Respondent's assertions that she did not understand the significance of the cracks at the Property or the records provided to her for the Property, and did not understand her duties in connection with her sale of the Property were similarly unpersuasive. At the time of her purchase and sale of the Property, Respondent was a former real estate agent who had been involved in a number of real estate purchases. In the Arbitrator's view, the evidence and Respondent's constantly shifting testimony established that she understood both the significance of the problems identified in the disclosures and her obligation to disclose the problems to Claimants. Respondent's failure to disclose the documents and material facts therein to Claimants were intentional acts designed to conceal relevant information from Claimants and enable her to make a profit on the sale of the Property to Claimants (Final Award, page 26);

(f) Consistent with the foregoing, the Arbitrator finds that while under a duty to disclose material facts regarding the Property to Claimants, Respondent intentionally concealed the material facts set forth in the AVIDs of de Vries and Milestone and the Agent Detail Report with the intent to defraud Claimants (Final Award, page 27);

(g) Based upon the evidence presented and consistent with the foregoing, the Arbitrator finds that Claimants were unaware of the material facts that Respondent failed to disclose in connection with Claimants' purchase of the Property and that Claimants would not have acted as they did if they had known of the concealed facts. Respondent's argument that Claimants, via the TDS and Home Inspection Report, had knowledge of numerous cracks at the home and thus had notice of foundation movement at the Property is not supported by the evidence. Respondent's portion of the TDS did not mention cracks. Respondent's agent's portion of the TDS mentions "cracks" in the drywall of the guest bedroom, external cracks between the concrete staircase and the home, and that the front yard retaining wall was leaning. The Home Inspection Report obtained by Claimant identified a number of "potentially significant improvements" that should be addressed at the Property, including: (1) horizontal cracking in the foundation at the rear of the crawlspace and the usual cause of this issue (how the concrete was poured); (2) substantial damage to the wood retaining wall (noting that

rebuilding may be necessary in the short term), and (3) the retaining walls at the front and rear of the Property showing evidence of movement (without stating the rate at which it was moving). The TDS and Home Inspection Report identified limited problems at the Property. As noted by Claimants' experts, cracks happen at a property. Limited cracks are expected. As compared to the problems identified in the photos of the Property available when Respondent purchased the Property and the disclosures made to Respondent, the problems identified to Claimants were minimal. Respondent's nondisclosures deprived Claimants of the ability to have someone look at the history of the Property and the issues that existed when Respondent purchased the Property (Final Award, pages 27-28);

(h) The weight of the evidence established that Claimants acted reasonably in response to Respondent's limited disclosures. Bernaz reviewed the disclosures that he received (unlike Respondent) and followed up with securing additional inspections. After a review of the Home Inspection Report, Claimants obtained an additional visual inspection report from Avalon[2]. However, due to Respondent's failure to disclose the problems at the Property and her cosmetic repairs thereto, it appears that Avalon did not have the necessary information to do a proper assessment. The report prepared by Avalon did not recommend or indicate the need for further investigation of the Property, or in particular, the structural integrity of the Property, and there is no indication to anyone receiving this report that follow-up structural evaluation or soils evaluation was necessary. Without such a suggestion, Claimants had no reason to know that additional investigative work was needed at the Property. Based upon the record presented, if Respondent had disclosed the information contained in the Agent Detail Report and de Vries AVID to Claimants in connection with Respondent's sale of the Property, it is reasonably likely that Claimants would not have purchased the Property, or that the purchase would not have been on the same terms (Final Award, page 27);

(I) Consistent with the foregoing, Claimants have established their reliance upon Respondent's fraudulent nondisclosure of material facts (of which Claimants were unaware) and Claimants would not have acted as they did if they had known of the concealed facts (Final Award, page 28);

---

[2]"Avalon" means Avalon Structural, Inc., California License 677116, Classifications: B, C-8.

1   (j) Consistent with the foregoing, Claimants are entitled to recover from Respondent

2   damages in the amount of $990,713.11 resulting from Respondent's fraudulent concealment of

3   material facts (Final Award, page 30);

4   (k) Consistent with the foregoing, the Arbitrator finds in favor of Claimants against

5   Respondent on Claimants' fraudulent concealment claim. Claimants are entitled to recover from

6   Respondent damages in the amount of $990,713.00 resulting from Respondent's fraudulent

7   concealment of material facts (Final Award, page 30, Section IV. A. 6);

8   (l) Paragraph 22B of the Agreement is an agreement to binding arbitration of "any dispute or

9   claim in law or equity arising between them out of this Agreement or any resulting transaction."

10  Paragraph 25 of the Agreement states, "In any action, proceeding or arbitration between Buyer and

11  Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable

12  attorneys' fees and costs from the non-prevailing Buyer or Seller . . ."  Consistent with the balance of

13  this Award, Claimants are the prevailing party in the arbitration (Final Award, page 31);

14  (m) Consistent with the foregoing, Claimants' motion to recover attorneys' fees from

15  Respondent pursuant to the terms of the Agreement is GRANTED in the amount of $106,270 (Final

16  Award, page 33);

17  (n) Rule 24(g) of the JAMS Comprehensive Arbitration Rules provides that "[t]he Award of

18  the Arbitrator may allocate attorneys' fees and expenses . . . if provided by the Parties' Agreement or

19  allowed by applicable law." Again, the Agreement provides in pertinent part that, "In any action,

20  proceeding or arbitration between Buyer and Seller arising out of this Agreement, the prevailing

21  Buyer or Seller shall be entitled to reasonable attorneys' fees and costs from the non-prevailing

22  Buyer or Seller . . ." (Final Award, page 33);

23  (o) Consistent with the foregoing and the broad clause in the parties' agreement regarding

24  costs, the categories and amounts of costs requested by Claimants are reasonable. Accordingly,

25  Claimants are entitled to recover reasonable costs from Respondent in the amount of $64,892.57

26  (Final Award, page 34);

27  (p) The evidence presented at the hearing established that Respondent concealed material

28  facts from Claimants regarding the Property and that Claimants testified would have caused them to

either not purchase the property or to have investigated it more thoroughly. The evidence further established that Respondent, by refusing to acknowledge any liability, by making no settlement offers, and by adopting the tone and attitude she displayed in her communications with Claimants' counsel, forced Claimants to arbitrate this matter. From the sale of the Property through the present date, Respondent has had the use of the funds that she now owes Claimants. Under these facts, Claimants are entitled to recover prejudgment interest on the damages to which Claimants are entitled ($990,713.00) for the period requested (February 6, 2019 [the date Claimants retained counsel] to the date of this award). The failure to award interest on this sum would reward Respondent's denial of liability and condone her forcing Claimants to arbitrate this matter to a conclusion. Consistent with the foregoing, Claimants are entitled to recover prejudgment interest from Respondent in the amount of $231,799.64 (Final Award, page 35);

(q) Consistent with the foregoing, Claimants' motion to recover attorneys' fees, costs, and interest from Respondent is GRANTED in the amount of $402,962.21 ($106,270 + $64,892.57 + $231,799.64) (Final Award, page 35); and

(r) Consistent with the foregoing, the Arbitrator enters a Final Award in favor of Claimants Steven Bernaz and Christine Lee and against Respondent Lilly Vu in the amount of $1,393,676.21 ($990,713.00 + $402,963.21) (Final Award, page 35).

**FIRST CLAIM FOR RELIEF**

**(For Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A))**

15.     Plaintiffs repeat and reallege the allegations in above paragraphs 1 through 14, inclusive, as though fully set forth herein.

16.     11 U.S.C. § 523(a)(2)(A) provides:

"A discharge under section 727 … of this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition".

17.     Pursuant to 11 U.S.C. § 523(a)(2)(A), the Final Award, and the Judgment, there are

misrepresentations, fraudulent omissions or deceptive conduct by the Debtor; (2) Debtor had

knowledge of the falsity or deceptiveness of her statements or conduct; (3) Debtor had an intent to

deceive; (4) there was justifiable reliance by the Plaintiffs on the Debtor's statements or conduct; and

(5) there was damage to the Plaintiffs proximately caused by their reliance on the Debtor's statements

or conduct.

18.     For example, and without realleging the entire findings in the Final Award and

Judgment, Plaintiffs allege:

(a) Respondent concealed a number of material facts affecting the value or desirability

of the Property from Claimants in connection with their purchase of the Property (Final

Award page 24);

(b) The statements would have affected the value or desirability of the Property if

disclosed by Respondent, and were, therefore, material facts (Final Award page 25);

(c) the evidence established that Respondent either knew or must have known of these

facts;

(d) Given the foregoing, Respondent undoubtedly knew about material facts (i.e.,

statements that the Property had visible structural issues and cracks throughout the home)

(Final Award page 25);

(e) In addition to her knowledge of these material facts, Respondent also knew that

these facts were not known to, or within the reach of the diligent attention and observation of

Claimants. (Final Award page 25);

(f) Based upon the foregoing, Respondent was under a duty to disclose to Claimants

the material statements (regarding cracks and visible structural problems) in the Agent Detail

Report and the AVIDs. (Final Award paged 25-26);

(g) Respondent essentially conceded that she failed to disclose the material facts in the

documents (and failed to disclose the documents as required by the SPQ) prior to her sale of

the Property to Claimants. The evidence also established that Respondent made

misrepresentations in her disclosures to Claimant. Respondent falsely stated in the TDS that

she was unaware of alterations or repairs without necessary permits. Respondent falsely

stated in the SPQ that: (1) there were no alterations, modifications, improvements, remodeling, or material repairs to the Property; (2) she was not aware of any settling from any cause, or slippage, sliding or other soil problems; (3) she was not aware of any alterations, modifications, (4) while she stated that she was aware of replacements, improvements, remodeling or material repairs on the Property for the purpose of energy or water efficiency and explained that these improvements were painting, new landscape and new driveway, she failed to mention any of the crack and gap covering in the interior of the home; and (5) perhaps most critically, she stated that she was unaware of "reports, inspections, disclosures, . . . maintenance recommendations, . . . or other documents pertaining to . . . the condition or repair of the Property or any improvement on this Property in the past, now or proposed." (Final Award page 26);

(h) Respondent's failure to disclose the documents and material facts therein to Claimants were intentional acts designed to conceal relevant information from Claimants and enable her to make a profit on the sale of the Property to Claimants. (Final Award page 26);

(I) Consistent with the foregoing, the Arbitrator finds that while under a duty to disclose material facts regarding the Property to Claimants, Respondent intentionally concealed the material facts set forth in the AVIDs of de Vries and Milestone and the Agent Detail Report with the intent to defraud Claimants. (Final Award, page 27);

(j) Claimants were unaware of the material facts that Respondent failed to disclose in connection with Claimants' purchase of the Property and that Claimants would not have acted as they did if they had known of the concealed facts. (Final Award, page 27);

(k) The weight of the evidence established that Claimants acted reasonably in response to Respondent's limited disclosures. (Final Award, page 28);

(l) Claimants have established their reliance upon Respondent's fraudulent nondisclosure of material facts (of which Claimants were unaware) and Claimants would not have acted as they did if they had known of the concealed facts (Final Award, page 28); and

(m) Consistent with the foregoing, Claimants are entitled to recover from Respondent damages in the amount of $990,713.11 resulting from Respondent's fraudulent concealment

Case: 23-05030   Doc# 1   Filed: 09/08/23   Entered: 09/08/23 10:10:30   Page 12 of 61

of material facts. (Final Award , page 30) and the Arbitrator enters a Final Award in favor of Claimants Steven Bernaz and Christine Lee and against Respondent Lilly Vu in the amount of $1,393,676.21 ($990,713.00 + $402,963.21) (Final Award, page 35).

WHEREFORE, the Plaintiffs pray for judgment as set forth below.

**SECOND CLAIM FOR RELIEF**

**(For Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4))**

20.     Plaintiffs repeat and reallege the allegations in above paragraphs 1 through 19, inclusive, as though fully set forth herein.

21.     11 U.S.C. **§** 523(a)(4) provides:

"A discharge under section 727 … of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny".

22.     Debtor's acts and omissions, as described in the Final Award, the Judgment, and hereinabove, were tortuous and as caused the resulted harm to Plaintiffs as indicated hereinabove.

23.     Debtor's acts and omissions, as described in the Final Award, the Judgment, and hereinabove, demonstrate Debtor's felonious taking of Plaintiffs' personal property with intent to convert it or deprive Plaintiffs of the same, as such larceny.

24.     A real estate seller has both a common law and statutory duty of disclosure of material facts affecting the value or desirability of the property. (i.e. See California Civil Code 1102, 1102.6, etc.  See also *Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 161- "In the context of a real estate transaction, it is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property ... and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer." and  *Shapiro v. Sutherland* (1998) 64 Cal.App 4th 1534, 1544- "Undisclosed facts are material if they would have a significant and measurable effect on market value."

25.     Pursuant to California Civil Code 1102.13 "any person who willfully or negligently

1  violates or fails to perform any duty prescribed by any provision of this article shall be liable in the

2  amount of actual damages suffered by a transferee."

3      26.    For example, and without realleging the entire findings in the Final Award and

4  Judgment, Plaintiffs allege:

5      (a) Based upon the record presented, Respondent concealed a number of material facts

6  affecting the value or desirability of the Property from Claimants in connection with their purchase

7  of the Property. (Final Award, page 24);

8      (b) While Respondent claims that she had no intention to conceal any information from

9  Claimants or misrepresent certain facts, the evidence was to the contrary. (Final Award , page 26);

10      (c) the evidence and Respondent's constantly shifting testimony established that she

11  understood both the significance of the problems identified in the disclosures and her obligation to

12  disclose the problems to Claimants. Respondent's failure to disclose the documents and material

13  facts therein to Claimants were intentional acts designed to conceal relevant information from

14  Claimants and enable her to make a profit on the sale of the Property to Claimants. (Final Award,

15  page 26);

16      (d) Consistent with the foregoing, the Arbitrator finds that while under a duty to disclose

17  material facts regarding the Property to Claimants, Respondent intentionally concealed the material

18  facts set forth in the AVIDs of de Vries and Milestone and the Agent Detail Report with the intent to

19  defraud Claimants.  (Final Award, page 27); and

20      (e) Consistent with the foregoing, Claimants are entitled to recover from Respondent

21  damages in the amount of $990,713.11 resulting from Respondent's fraudulent concealment

22  of material facts. (Final Award , page 30) and the Arbitrator enters a Final Award in favor of

23  Claimants Steven Bernaz and Christine Lee and against Respondent Lilly Vu in the amount

24  of $1,393,676.21 ($990,713.00 + $402,963.21) (Final Award, page 35).

25      27.    Debtor's acts and omissions, as described in the Final Award, the Judgment, and

26  hereinabove, demonstrate Debtor had a subjective motive to inflict injury or a subjective belief that

27  injury was substantially certain to result from her conduct and Debtor wrongfully and with fraudulent

28  intent took property from Plaintiffs, its owner.

Case: 23-05030   Doc# 1   Filed: 09/08/23   Entered: 09/08/23 10:10:30   Page 14 of 61

WHEREFORE, the Plaintiffs pray for judgment as set forth below.

**THIRD CLAIM FOR RELIEF**

**(For Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6))**

28.     Plaintiffs repeat and reallege the allegations in above paragraphs 1 through 27, inclusive, as though fully set forth herein.

29.     11 U.S.C. **§** 523(a)(6) provides:

> "A discharge under section 727 … of this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity".

30.     Debtor's acts and omissions as described hereinabove were done willfully and maliciously and caused the resulted harm to Plaintiffs as indicated hereinabove.

31.     A real estate seller has both a common law and statutory duty of disclosure of material facts affecting the value or desirability of the property. (i.e. See *California Civil Code 1102, 1102.6, etc.* See also *Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 161- "In the context of a real estate transaction, it is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property ... and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer." and *Shapiro v. Sutherland* (1998) 64 Cal.App 4th 1534, 1544- "Undisclosed facts are material if they would have a significant and measurable effect on market value."

32.     Pursuant to California Civil Code 1102.13 "any person who willfully or negligently violates or fails to perform any duty prescribed by any provision of this article shall be liable in the amount of actual damages suffered by a transferee."

33.     For example, and without realleging the entire findings in the Final Award and Judgment, Plaintiffs allege:

(a) Based upon the record presented, Respondent concealed a number of material facts affecting the value or desirability of the Property from Claimants in connection with their purchase of the Property. (Final Award, page 24);

(b) While Respondent claims that she had no intention to conceal any information from Claimants or misrepresent certain facts, the evidence was to the contrary. (Final Award , page 26);

(c) the evidence and Respondent's constantly shifting testimony established that she understood both the significance of the problems identified in the disclosures and her obligation to disclose the problems to Claimants. Respondent's failure to disclose the documents and material facts therein to Claimants were intentional acts designed to conceal relevant information from Claimants and enable her to make a profit on the sale of the Property to Claimants. (Final Award, page 26);

(d) Consistent with the foregoing, the Arbitrator finds that while under a duty to disclose material facts regarding the Property to Claimants, Respondent intentionally concealed the material facts set forth in the AVIDs of de Vries and Milestone and the Agent Detail Report with the intent to defraud Claimants. (Final Award, page 27); and

(e) Consistent with the foregoing, Claimants are entitled to recover from Respondent damages in the amount of $990,713.11 resulting from Respondent's fraudulent concealment of material facts. (Final Award , page 30) and the Arbitrator enters a Final Award in favor of Claimants Steven Bernaz and Christine Lee and against Respondent Lilly Vu in the amount of $1,393,676.21 ($990,713.00 + $402,963.21) (Final Award, page 35).

34.     Debtor's acts and omissions, as described in the Final Award, the Judgment, and hereinabove, demonstrate Debtor had a subjective motive to inflict injury or a subjective belief that injury was substantially certain to result from her conduct.

35.     Debtor's acts and omissions, as described in the Final Award, the Judgment, and hereinabove, were wrongful, done intentionally, caused injury, and were done without just cause or excuse.

WHEREFORE, the Plaintiffs pray for judgment as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.     On the First, Second, and Third Claims for Relief, an Order of this Court determining that the full amount of Debtor's debt to Plaintiffs is excepted from discharge and is

Case: 23-05030   Doc# 1   Filed: 09/08/23   Entered: 09/08/23 10:10:30   Page 16 of 61

1    non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523 (a)(4), and 523(a)(6); and

2            2.      For such other and further relief as the Court deems just and equitable.

3    Dated: September 8, 2023

                                            LAW OFFICE OF WILLIAM J. HEALY
4                                           */s/ William J. Healy*
                                            William J. Healy

Case: 23-05030    Doc# 1    Filed: 09/08/23    Entered: 09/08/23 10:10:30    Page 17 of 61

# EXHIBIT A

**STEVEN BERNAZ and CHRISTINE LEE,**

   **Claimant,**

  **and**

**LILLY VU,**

   **Respondent.**

_____

# FINAL AWARD

   THE UNDERSIGNED, having been appointed as the arbitrator, and having examined the submissions, proof, and allegations of the parties, finds, concludes, and issues this Final Award, disposing of all matters herein.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

1. <u>Parties and Counsel.</u> The parties to this arbitration are identified in the above caption and are represented as follows:

  David Hamerslough (SBN 95010)
  Rossi, Hamerslough, Reischl & Chuck
  1960 The Alameda, Suite 200
  San Jose, CA 95126-1493
  Tel: (408)261-4252
  Fax: (408)261-4292
  <u>dave@rhrc.net</u>

  Counsel for Claimant

  Michael Chinh Vu (SBN 178148)
  VU.S.A Law Offices, APC
  142 East Mission Street
  San Jose, CA 95112
  T: 408-288-7400
  F: 408-288-7798
  <u>michaelvu@vusalaw.com</u>

Counsel for Respondent


2.    Arbitrator:

      Hon. Kevin E. McKenney (Ret.)
      JAMS
      160 W. Santa Clara Street, Suite 1600
      San Jose, CA 95113
      T: (408) 288-2240
      F: (408) 295-5767


3.    Arbitrator's Case Manager:

      Karume Richards
      Silicon Valley JAMS
      160 West Santa Clara Street Suite 1600
      San Jose, CA 95113
      T: 408-346-0764
      F: 408-295-5267
      krichards@jamsadr.com


4.    Agreement to Arbitrate:  The Arbitration clause is contained in the California Residential
      Purchase Agreement and Joint Escrow Instructions, (dated July 16, 2018) (the
      "Agreement"), ¶ 22. B.


5.    Pleadings and Arbitrability:  The claims are stated in the Demand for Arbitration
      filed by Claimant on January 17, 2020. The claims are arbitrable.


6.    Applicable Law and Rules:  Under the Agreement, "[t]he parties shall have the right to
      discovery in accordance with the Code of Civil Procedure section 1283.05. In all other
      respects, the arbitration shall be conducted in accordance with Title 9 of Part 3 of the
      Code of Civil Procedure" together with the applicable JAMS Comprehensive Arbitration
      Rules ("Rules") which shall apply in this proceeding unless the parties otherwise agree in
      writing.


7.    Arbitration Hearing:  On August 16, 2021, each side submitted pre-hearing briefs. Before
      the start of the arbitration hearing, Claimants' exhibits 1-28 and Respondent's exhibits A-
      K were admitted into evidence. Phase I of the arbitration took place on August 24-27,
      September 7-8, 24, and October 7, 2021, at the law of offices of Rossi, Hamerslough,
      Reischl & Chuck. A court reporter transcribed the Phase I arbitration hearing. The issues
      of the amount of costs and attorneys' fees to which any party may be entitled were
      bifurcated and are to be determined after the Phase I Hearing. Additional exhibits were

2
**Final Award**

admitted into evidence during the hearing. The following witnesses testified during the hearing: Respondent Lilly Vu, John Quoc Ly, Wilfredo Escobar, Angelina Escobar, Edward Milestone, Steven Spears, Patrick Shires, David Matthews, Dan Dyckman, Jeff Beam, Bruce Matheson, Rocky Rieger, Victoria Naidorf, and Claimant Steven Bernaz. On December 20, 2021, counsel made closing arguments at the JAMS Silicon Valley office.

8.   <u>Interim Award and Motion for Attorneys' Fees:</u>  On February 18, 2022, the Interim Award was completed and signed by the Arbitrator. Due to non-payment of administrative fees, the Interim Award was not issued to the parties until April 29, 2022. In the Interim Award, the Arbitrator found in favor of Claimants and against Respondent and found Claimants to be the prevailing party in the arbitration. The Interim Award permitted Claimants to file a motion for attorneys' fees and costs (and Respondent to oppose the motion) pursuant to the schedule set forth therein.

On May 16, 2022, Claimants filed a motion for reasonable attorneys' fees, costs and interest on the amounts awarded. On May 26, 2022, counsel for Respondent advised Claimants' counsel and the Arbitrator that Respondent would not be filing an opposition to the motion. As such, the matter was deemed submitted for decision on May 26, 2022.

9.   Date of Final Award:   June 9, 2022

## II. FACTS

The following is a statement of those facts found by the Arbitrator to be true and necessary to this Final Award. To the extent this recitation differs from either party's position, that is the result of the Arbitrator' resolution of the factual disputes, including the making of determinations as to the credibility of witnesses and the relevancy of evidence, as well as determinations of the burden of proof, and an overall weighing of the evidence, both oral and written.

### *Respondent's Purchase of the Property*

Respondent Lilly Vu ("Respondent" or "Lilly") was a licensed real estate agent from 2001 to 2005. As an agent, she was involved in the purchase of six homes. She also purchased three or four other homes. She acquired several of these properties for purposes of investment. Despite her attempts to downplay her experience as a licensed agent, the record reflects that Respondent is intelligent and has significant knowledge concerning a party's and an agent's obligations in connection with the purchase and sale of real estate.

In late July 2017, Respondent viewed ("two, three" times) real property located at 14906 Reynaud Drive, San Jose, California ("the Property"). *See* Hearing Exhibit ("Ex.")

4 at 1. The home on the Property was constructed in 1961. The Property was being sold by an administrator and trustee who were not the primary owners of the Property and did not have knowledge of the Property's history, and thus were exempt from preparing a Transfer Disclosure Statement. Ex. 4 at 4.

In connection with her ultimate purchase of the Property, Respondent received the required disclosures and other documents concerning the Property. Ex. 4 at 4. The Single-Family Homes Agent Detail Report ("Agent Detail Report"), dated August 7, 2017, and prepared by the seller's agent, states, *inter alia*, that "Home needs updates to all major systems," and **"Home needs updates to all major systems & has visible structural issues."** Ex. 1 (Emphasis added). The document bears Respondent's initials.

The listing agent for the Property was Andrew de Vries. Ex. 1. In connection with the listing, de Vries was required to complete an Agent Visual Inspection Disclosure ("AVID"). *Id.* The AVID provides that:

> **California law requires**, with limited exceptions, that a real estate broker or salesperson (collectively, "Agent") conduct a reasonably competent and diligent visual inspection of reasonably and normally accessible areas of certain properties offered for sale and then disclose to the prospective purchaser material facts affecting the value or desirability of that property that the inspection reveals. The duty applies regardless of whom that Agent represents. The duty applies to residential real properties containing one-to-four dwelling units . . . .

> **California law does not require** the Agent to inspect the following:
> • Areas that are not reasonably and normally accessible
> . . .

> **What this means to you**: An Agent's inspection is not intended to take the place of any other type of inspection, nor is it a substitute for a full and complete disclosure by a seller. Regardless of what the Agent's inspection reveals, or what disclosures are made by sellers. California Law specifies that a buyer has a duty to exercise reasonable care to protect himself or herself. This duty encompasses facts which are known to or within the diligent attention and observation of the buyer. Therefore, in order to determine for themselves whether or not the Property meets their needs and intended uses, as well as the cost to remedy any disclosed or discovered defect, BUYER SHOULD: (1) REVIEW ANY DISCLOSURES OBTAINED FROM SELLER; (2) OBTAIN ADVICE ABOUT, AND INSPECTIONS OF, THE PROPERTY FROM OTHER APPROPRIATE PROFESSIONALS; AND (3) REVIEW ANY FINDINGS OF THOSE PROFESSIONALS WITH THE PERSONS WHO PREPARED THEM. IF BUYER FAILS TO DO SO, BUYER IS ACTING AGAINST THE ADVICE OF BROKER.

*See* Ex. 2.

The July 21, 2017, AVID prepared by de Vries for the Property was initialed by Respondent. Concerning the entry, living room, dining room, kitchen, all three bedrooms, and both bathrooms, the AVID states:

Walls, floors, windows, doors, ceilings and other surfaces have scratches, cracks, scuffs, stains and other imperfections in place. Ex. 2. Concerning the living room, de Vries also stated that the "Wall has major holes and **what appears to be visible structural movement within**." Ex. 2 (Emphasis added). With respect to the second bathroom, de Vries stated "Floor is soft from past plumbing leak." In the "Other" portion of the AVID, de Vries stated

Home appears to have visible structural issues to walls in the living room and front exterior staircase.

Home has sizable moisture damage to floor in bathroom.

**All major systems of the home, including** but not limited to, roof, electrical, plumbing, sewer, windows, heating, flooring, siding, **foundation, are in need of repairs or updating**.

Ex. 2 (Emphasis added). The AVID notes that the "Garage Floor has cracks in places," and that with respect to the exterior of the building, "Front stairs appeared to have pulled away from the home. Balconies have cracks, as do all walkways and patios. Driveway pavement is heavily damaged and need of repaving." *Id.* de Vries' AVID concludes by stating that:

Other Observed or Known Conditions Not Specified Above: <u>This is an as is Probate and Trust sale and the sellers and seller's broker have limited knowledge of the property's condition. Buyers are advised to get any and all inspections</u>

Ex. 2.

Photographs of the Property, available at the time of Respondent's purchase, showed multiple exterior cracks and interior cracks or gaps. Exs. 28-29. On August 2, 2017, Respondent's real estate agent for the transaction, Edward Milestone ("Milestone"), emailed to Respondent the pest reports regarding the Property and all of the disclosures prepared by the seller for the Property. *Id.* at 3. Milestone's email to Respondent noted his concerns regarding "termite infestation," "water leaking/plumbing issues that run through the home," and "dry rot on the support posts and decks." *Id.* In the email to Respondent, Milestone stated:

The bad news: until the home is probed, the extent of damage is impossible to

determine. If you believe the repairs are within your ability to deal with and you would still like to make an offer, I suggest we contact a contractor that could preview the home in order to give you his professional opinion before an offer is submitted. . . .

Ex. 4 at 3.

On August 3, 2017, Respondent emailed Milestone, noting her receipt of the seller disclosures and pest reports, and stated that she consulted with "her contractor/ husband" and was "aware of the problems with the house." Ex. 4 at 3. Outside of talking to her husband, John Quoc Ly ("Ly"), and visiting the Property with him, Respondent did not investigate the "problems" with the Property. Ly, however, testified that Respondent did not ask him any questions about the Property at this time. Ly is not a licensed contractor. Prior to the purchase of the Property, Ly's work for Respondent on her homes was limited to painting and making a house more presentable. He had, however, taken a course at CET school regarding construction, where he learned how to make general repairs (e.g., painting, fixing cracks (by patching), and fixing holes in a wall) to make properties prettier.

Milestone's AVID is dated August 27, 2017, and is initialed by Respondent. Ex. 3. Milestone noted "scuff marks and cracks and stains on floors, walls, doors, shelves and ceiling" in the dining room, kitchen, stairs, bedrooms, and both bathrooms. *Id.* In the entry, he noted, "crack on the floor." For the living room, he noted that "Walls have holes and exposed studs and joist that are bent outward from wall. Cracks in sheetrock." *Id.* Concerning the kitchen, he stated "Stains under sink and crack in floor in front of sink. …. Plumbing shows signs of leaking." *Id.* For each of the bedrooms and the non-master bathroom, he noted "Gaps in corners on walls and floor." *Id.* As to the non-master bathroom, he also noted "Floor covering missing and uneven." *Id.* On the third page of his AVID, Milestone stated "Deck off family room and kitchen slopes down and into property and shows signs of water intrusion," and for the garage, stated "Large cracks and uneven flooring. Ceiling has large holes and missing sheetrock. Stairs have loose treads and rot next to wall." *Id.* Finally, concerning the exterior of the Property, he stated "Stairs show signs of movement with uneven concrete, cracks. A brick decorative column is lifted." *Id.*

Respondent testified that she did not see any cracks at the Property before her purchase, and her husband did not point out any cracks before her purchase. She testified that she had no questions or concerns about the Property.

Respondent testified that before she purchased the Property, no one told her about cracks in the house and that she had not received anything in writing about any issues or potential problems or issues with the Property. Respondent testified that she did not look at or read any of the reports or documents she received regarding the Property and testified that no one told her that there were reports from the listing agent. Respondent

further testified that she did not read the disclosure reports because she was buying the house as-is and that after looking at Property, she and her husband did not see any major cracks or problems, had no concerns, and thought it would be okay to purchase the Property for their daughter. Respondent testified that as a result of the foregoing, the disclosures were not important to her. Respondent also testified that if there had been a major problem with the Property, she would not have brought it "for her daughter."

Given that Respondent initialed the Agent Detail Report and the AVIDs prepared by Milestone and de Vries, and the foregoing documents were emailed to her by Milestone before she purchased the Property, and her email to Milestone noting her awareness of "problems" at the Property, Respondent's testimony that she was unaware of problems at the house prior to her purchase is unbelievable. Respondent was aware of the problems outlined in the Agent Detail Report and the AVIDS but elected to purchase the Property notwithstanding the problems.

Respondent testified that if her agent had pointed out to her verbally that the house was not stable or needed a lot of work, or that the house is not good, that would have been a major problem for her at the time of purchase, then she would not have purchased the home. Respondent also testified that if either agent had told her when she purchased the Property that there were cracks in multiple rooms in the Property and structural issues with the Property, such information would have "of course" concerned Respondent (because it would raise a "red flag"). Respondent testified that neither agent made such an oral or written disclosure to Respondent. Respondent testified that in her experience, "cracks or multiple cracks might be a red flag which might be something that needed to be investigated because it could be indicative of a problem" that she and her husband could not fix (due to their lack of a license), and if that happened, they would not purchase the Property.

As set forth above, the problem with Respondent's testimony is that Milestone had, via email, provided her with the Agent Detail Report and the de Vries AVID, which clearly informed Respondent that the home "needs updates to all major systems & has visible structural issues," the walls, floors, ceilings and other surfaces "have scratches, cracks, scuffs, stains and other imperfections," that the home had major holes in a wall that "appears to be visible structural movement within," that the home appears to have "visible structural issues to walls in the living room and front exterior staircase.," and that the foundation was "in need of repairs or updating."

On August 27, 2017, Respondent made an offer to purchase the Property for $700,000. Ex. 5. The offer removes all contingencies and states that the buyer is purchasing the Property in as-is condition. *Id.* Respondent's offer was accepted by the seller on August 31, 2017. Ex. 5. In October 2017, escrow closed and Respondent purchased the Property for $700,000. Respondent testified that she purchased the Property for her daughter to live in. This testimony was not persuasive. She had been

7
**Final Award**

informed of numerous red flags regarding the Property. Her testimony regarding her purchase and subsequent remodeling of the Property does not comport with the conduct of a parent concerned with providing her child with a quality home. Her testimony instead suggested that she intended to flip the Property.

### *Respondent's Work on the Property*

Respondent initially had the roof replaced, fixed up the yard, and replaced the Property's driveway. Once Respondent learned, in January 2018, that her daughter would not be occupying the home, Respondent decided to renovate and sell the Property for a profit. At that point, Respondent and her husband began work on the interior of the Property. Respondent instructed Ly to make the home look "pretty."

At the hearing, Respondent testified that she visited the Property "six, seven" times after she purchased the Property. However, this testimony was impeached by her deposition testimony wherein Respondent testified that she had been to the Property "more than twenty times."

The evidence established that after Respondent's purchase, there were in fact cracks and gaps all over the house, with the majority of them in the living room, bedrooms, and bath. Exs. 28-30, 31, 44, and 45. However, during her deposition, Respondent testified that there were no cracks (or faults) of any kind at the Property. She also testified that her husband did not tell her about any cracks at the Property or other cracks that he fixed at the Property.

During the hearing, Respondent's testimony regarding her knowledge of cracks at the Property changed notably. Respondent testified that when she purchased the Property, she observed soft floors, some stains and cracks, cracks on the kitchen wall and kitchen ceiling, the outside wall (not attached to the house) by the driveway, the garage wall by the garage door, and the garage floor. Respondent, however, testified that the stains and cracks did not raise a red flag (issue) for her.

Ly did work on, *inter alia*, the bathrooms, bedrooms, kitchen, ceiling, and floor. In connection with the home's remodeling, Ly fixed what he terms "minor" cracks on the walls," "gaps" and the "uneven floor." While Ly initially testified that the cracks were just a separation in the paper in a corner of some of the rooms, he subsequently admitted that cracks he repaired were between an eighth and a sixteenth of an inch. Milestone testified that some of the cracks were up to a quarter of an inch. Ly performed work in the crawlspace to support the wall and hallway. His work included covering damages to the flooring with new Pergo flooring without repairing the underlying damage and painting the house. Respondent testified that she spent $80,000-$90,000 on the remodel.

As a result of the work performed by Ly on the Property, the problems caused by

soil movement on the Property (cracks, gaps, water intrusion at the back of the property [in particular near the master bedroom], water intrusion on the balcony and in the garage) existing when Respondent purchased the Property were not visible when Respondent subsequently listed the Property for sale (and sold the Property to Claimants).

### *Respondent's Marketing of the Property*

On June 25, 2018, Respondent entered into a listing agreement with a real estate agent for the sale of the Property. Ex. 9. Her agent did not see the Property before it was repaired by Respondent, and was not provided with any of the documents Respondent obtained when purchasing the Property. While Respondent prepared several disclosures in connection with the sale of the Property, her agent did not assist her with the disclosures. The Transfer Disclosure Statement ("TDS") prepared by Respondent is dated June 25, 2018. Ex. 12. The TDS form states that

> The Seller discloses the following information with the knowledge that even though this is not a warranty, prospective Buyers may rely on this information in deciding whether and on what terms to purchase the subject property. . . . .

*Id.* at 1. The TDS completed by Respondent, states, *inter alia*, that:

- she was not aware of any significant/malfunctions in the interior walls, ceilings, floors, exterior walls, roof, windows, doors, foundation, slabs, driveways, walls, plumbing, or other structural components.

- she was not aware of any settling from any cause, or slippage, sliding or other soil problems.

- she was not aware of any structural modifications, or other alterations or repairs made without necessary permits or not in compliance with building codes.

Ex. 12 at 2.

At the hearing, Respondent initially denied that she had the de Vries and Milestone AVIDs and the Agent Detail Report in per possession when she completed the TDS. This testimony, however, was impeached by her deposition testimony wherein she testified that she had the paperwork she received in connection with her purchase of the Property, including the AVIDS, in her possession when she sold the Property. While Claimants requested during the arbitration that Respondent produce the AVIDs and other documents she received in connection with her purchase of the Property, Respondent failed to do so.

Respondent also completed a "Seller Property Questionnaire" ("SPQ"), dated

June 25, 2018, for the Property, wherein Respondent made certain disclosures regarding the Property. Ex. 13. The SPQ provides that:

II.    The following are representations made by the Seller . . . This disclosure statement is not a warranty of any kind by the Seller . . . and is not a substitute for any inspections or warranties the principal(s) may wish to obtain. . . .

III.   Note to Seller: PURPOSE: To tell the Buyer about known material or significant items affecting the value or desirability of the Property and help to eliminate misunderstandings about the condition of the Property.

• Answer based on actual knowledge and recollection at this time.
• Something that you do not consider material or significant may be perceived differently by a Buyer.
• Think about what you would want to know if you were buying the Property today.
. . .
If you do not understand how to answer a question, or what to disclose …, whether on this form or the TDS, you should consult a real estate attorney . . . of your choosing.

IV.    **Note to Buyer**: PURPOSE: To give you more information about <u>known material or significant items</u> affecting the value or desirability of the Property and help to eliminate misunderstandings about the condition of the Property.
• Something that may be material or significant to you, may not be perceived the same way by the Seller.
• If something is important to you, be sure to put your concerns and questions in writing . . . .
• Sellers can only disclose what they actually know. Seller may not know about all material or significant items.
• Seller's disclosures are not a substitute for your own investigations, personal judgments or common sense.

Ex. 13. With respect to repairs and alterations, Respondent stated in the SPQ that:

- **she was not aware of any alterations, modifications, replacements, improvements, remodeling or material repairs on the Property** . . .
- she was aware of alterations, modifications, replacements, improvements, remodeling, or material repairs to the Property done for the purpose of energy or water efficiency . . .
- she was aware of any part of the Property being painted within the last year.

*Id.* at 2 (Emphasis added). Her explanation for the foregoing states "new interior & exterior paint, new landscape, new driveway." *Id.*

With respect to Structural, Systems, and Appliances, Respondent stated that she was aware of defects "(including past defects that have been repaired) in any of the following: heating, air conditioning, electrical, plumbing . . ., water, sewer, waste disposal or septic system, sump pumps, well, roof, gutters, chimney, fireplace, foundation, crawl space, attic, soil, grading, drainage, retaining walls, interior or exterior doors, windows, walls, ceilings, floors, or appliances." Ex. 13 at 2. Her explanation for this response states "new roof, doubled paneled windows, new patio French door, new front door, new plumbing." *Id.*

Concerning water-related and mold issues, Respondent stated that she was not aware of "water intrusion into any part of any physical structure on the Property; leaks from or in any appliance, pipe, slab or roof; standing water, drainage, flooding, underground water, moisture, water-related soil settling or slippage, on or affecting the Property." *Id.*

In Section M of the SPQ, Respondent stated "No" when asked if she was aware of the following:

1.    Reports, Inspections, disclosures, warranties, maintenance recommendation, estimates, studies, surveys or other documents, pertaining to (i) the condition or repair of the Property or any improvement on this Property in the past, now or proposed; . . .

(If yes, provide any such documents in your possession to Buyer).

Ex. 13 at 3. During her deposition, Respondent testified that there is nothing that she would change in her disclosure reports, i.e., the statements therein were true.

Given that she initialed the AVIDs and the 2017 Listing Report when she purchased the property, and her testimony that she had the documents in her possession at the time of her listing of the Property, Respondent's SPQ falsely states that she was not aware of reports, inspections, disclosures, surveys, or other documents about the condition or repair of the Property, and improperly failed to include the two AVIDs and the Listing Report she had received when she purchased the Property and that advised Respondent of, among other things, cracks and gaps throughout the home and the visible structural issues with the Property. Given that the lighting repairs completed by Respondent/her husband were completed without permits, the testimony also established that Respondent falsely stated in the SPQ that no repairs were done without necessary permits.

Respondent's disclosures made no mention of the cracks and gaps that had existed in the home at the time Respondent purchased it and that had been covered up by Respondent's husband during the remodeling and renovation of the home.

Respondent, when asked whether the information that she provided on the TDS and the SPQ and her failure to provide the historical documentation (the AVIDs and photographs, prevented Claimants from having the opportunity to evaluate that material and make their own decision on whether it was significant or not, did not agree, stating that the Property was listed as-is and Claimants could have done more inspections.

On July 6, 2018, Respondent listed the Property for sale, with a list price of $1,098,880. Ex. 10. The description of the Property in the listing provided in part that:

> Located on a hillside lot of approximately 9,019. Beautiful open floor plan, separate family room, spacious living room **with mostly everything updated & remodeled from roof to floor**.

Ex. 10 (Emphasis added). When asked whether the highlighted statement was accurate, Respondent stated that she could not answer the question because it was the listing agent who helped Respondent put the Property on the market. Respondent testified that the use of "remodeled" meant fixed and renovated to her.

The photos taken of the Property to be shown to prospective purchasers (and displayed on the Redfin website in connection with Respondent's sale of the Property) do not show the cracks, gaps, water intrusion, sloping balconies, and other issues that existed at the Property when purchased by Respondent. Ex. 32. Respondent did not provide the photographs of the Property when she purchased the Property to prospective purchasers such as Claimants.

On July 16, 2018, Respondent's listing agent filled out the agent portion of Respondent's TDS that had previously been blank. Ex. 15. In "Agent's Inspection Disclosure," Respondent's agent stated, "Internal scratches on cabinets in kitchen and bedroom, cracks in drywall of guest bedroom . . . ," and that "External cracks between concrete staircase and home, retaining wall in front yard is leaning." *Id.*

### Claimants Purchase the Property

In connection with looking to purchase a home, Claimants saw a number of photographs of the Property on the Redfin website and went to the Property. Ex. 32. During their visit, they did not see any: (1) cracks in the interior of the home; (2) gaps or separations in the walls; or (3) problems with the outside retaining wall. The fact that the Property was located on a hillside did not concern Claimants. Discussions with their real estate agent, Sean St. Cin of Coldwell Banker, did not address the location of or soil at the Property.

On July 17, 2018, Claimants submitted an offer to Respondent to purchase the Property for $1,058,800. Ex. 14. The next day, Respondent submitted a counteroffer, stating in pertinent part that "[p]urchase price to be $1,089,880 as is condition," and "all other terms and conditions

remain the same." *Id.* Claimants accepted the counteroffer later the same day (hereinafter, the "Agreement"). *Id.* The Agreement includes the Buyer's Inspection Advisory, and requires Respondent to disclose, *inter alia*, a TDS and a SPQ. Thereafter, Claimants received disclosures from Respondent, including but not limited to the TDS, SPQ, Respondent's agent's AVID (exhibit 50), a natural hazard disclosure, a pest control report.

Claimants, however, did not receive from Respondent the de Vries AVID, the Milestone AVID, or the Agent Detail Report. Claimants received these documents after the commencement of the arbitration.

At the direction of their agent, Claimants ordered a home inspection report, pest report, and roof report from HomeGuard. On July 20, 2018, Claimants received the Home Inspection Report regarding the Property. Ex. 16. In the section addressing immediate recommended improvements, the Home Inspection Report states in part:

> 1. Horizontal cracking was noted to the foundation at the rear of the crawlspace under the bathroom. This usually is due to the reinforcing steel being too close to the outer edge of the foundation forms when the concrete is first poured. Many times when the foundation cures the crack appears in line with the reinforcing steel (rebar). This can expose the steel (rebar) to excessive moisture, which in turn leads to rust and corrosion. A thorough evaluation of this condition is beyond our qualifications. Concerned parties can have a licensed foundation specialist evaluate these cracks and make recommendations for repair. (See Photo 13) (See Photo 14)

> 2. Foundation cracking and/or movement was observed in the foundation walls in the crawl space. The rate of movement cannot be predicted during a one-time inspection. A thorough evaluation of this condition is beyond our qualifications. For additional information we recommend a licensed foundation specialist be retained. (See Photo 15)

> 7. The wood retaining wall at the rear shows evidence of substantial damage. It is difficult to determine when rebuilding will become necessary. Rebuilding may be necessary in the short term. Further evaluation of this condition by the appropriate tradesperson is recommended. (See Illustration 3Y) (See Photo 5)

> 11. The retaining wall at the front and rear shows evidence of movement. It is impossible to determine the rate of movement during a one time visit to the property. We recommend further evaluation by the appropriate trades for any recommendation deemed necessary to prevent further movement. (See Photo 3)

Ex. 16 at 3-5. Outside of the horizontal cracks, the other issues noted in the Home Inspection Report did not concern Claimants. Claimants were aware that a retaining wall at the front of the

home was leaning slightly. They were not aware, however, until after the close of escrow, that there was 4-foot crack in the brick wall in front of the house or that there were five or six cracks in the rear retaining wall. Had Respondent disclosed these issues, interior crack and/or the water intrusion issues, Claimants would have been able to follow up and investigate such issues.

After reading the Home Inspection Report, Claimants' agent retained Avalon Structural ("Avalon") to investigate the horizontal foundation fracture identified in the Home Inspection Report, and provided the Home Inspection Report to Avalon. On July 30, 2018, Claimants received an estimate by a foundation specialist (Roger Page of Avalon) in connection with the company's visual inspection of the horizontal foundation fracture. Ex. 17. The observations section of the estimate states:

> The majority of horizontal foundation fractures are caused by corrosion of the reinforcing steel, which is the result of moisture being in contact with the rebar. As the rust grows, the rebar swells much like a tree root, stressing and cracking the foundation stem.

> We observed a horizontal crack, approximately eight feet in total length above subarea grade, located at the middle-third of the rear perimeter wall. The horizontal foundation fracture has a width greater than a hairline crack but it may be merely superficial and not have led to rebar degradation. However, we must physically explore it to provide assurance.

> If the rebar is found to be healthy or with minor corrosion and no loss of mass, we can chip concrete around the rebar, creating a channel, to expose its full depth, treat it with a special coating and cover it with high-strength grout. If the fracture is full depth and the rebar is found to be corroded with more than 10% of mass loss, the horizontal crack should be repaired in accordance with the International Concrete Repair Institute guidelines, which includes removing the compromised concrete, replacing the corroded rebar, and placing new concrete.

Ex. 17.

Claimants read the Avalon report and based therein, it was their understanding that there was a horizontal crack and that this type of crack would be caused by metal rebar inside of the foundation, which "seemed inherent to the construction of the foundation." They understood that this was "like a 60-year-old type of problem that was limited in scope." There was nothing else about the Avalon report that led Claimants to believe that they needed to do any further investigation about the condition of the Property.

After reviewing the materials obtained, Claimants decided to continue with the purchase of the Property and removed contingencies. On August 14, 2018, escrow closed on the sale of the Property to Claimants.

*Claimants' Discovery of Defects and Conditions with the Property*

In December 2018, Claimants noticed cracks in the home's interior walls, water leakage through the walls, efflorescence, and water intrusion (flooding) in the garage area of the Property. Ex. 33. On April 24, 2019, and June 5, 2019, Claimants' counsel sent a letter to Respondent regarding the Property. Exs. 18 and 20. The letter provides in part that:

> Since the close of escrow, my clients have discovered a number of conditions and defects with the property that they claim you were aware of and failed to disclose. These conditions/defects include but are not limited to the
> following: (1) cracks in the retaining walls, (2) water coming through the walls of the garage and basement causing subsequent flooding, (3) water coming through the ceiling of the garage, (4) unpermitted work, (5) interior cracks that were patched, taped, and painted over, and (d) other foundation, drainage, and soil stability issues. You also failed to make a full and complete disclosure regarding the remodeling that you had done to the property, including who did that
> work, their qualifications and license status, whether permits were pulled and/or finaled, the conditions that prompted the remodeling work, any issues that were encountered during the remodeling, etc. My clients have retained consultants to evaluate these conditions and defects, and the preliminary assessment is that it is going to cost a significant amount of money to repair them.

*Id.* On July 5, 2019, Respondent responded to the letter. Ex. 19. The letter began by stating that the sale was pursuant to an "as is" agreement, and stated that:

> Escrow closed [on] August 14, 2018 with full disclosures provided to your clients as well as your clients' conducting their own independent inspections including, a home inspection by Pierre Belanger on July 31, 2018, a roof inspection by Christopher St. Laurent on July 23, 2018 both of Home Guard, and a structural report by Roger Page of Avalon Structural on July 31, 2018 as conditions to the contract. Any information now claimed by your clients about failure to disclose by me is simply not true and the facts undoubtedly will support my defense to these claims. Furthermore, any costly legal efforts by your clients will be futile.

*Id.*

*Evidence Regarding Needed Repairs for the Property*

At the hearing, the experts testified together as part of a roundtable discussion. The experts generally agreed that the house is significantly out of level, that the distress at the Property is caused by soil expansion, and that the Property needs to be repaired. The question or dispute amongst the experts was the appropriate scope of repair.

Case: 23-05030    Doc# 1    Filed: 09/08/23    Entered: 09/08/23 10:10:30    Page 33 of 61

## 1. Claimants' Expert Evidence

### a. Dan Dyckman

Dan Dyckman of GeoForensics, Inc., retained by Claimants, conducted a geotechnical investigation of the Property. He prepared a scope of repair for the Property, with the intent to "provide a residence and retaining walls which will perform comparable to that which would be expected of a stable older residence/property." Ex. 24. Dyckman testified regarding the scope of the problems at the Property, including the deficiencies in the retaining walls, water intrusion issues, interior sheetrock distress, and floor elevation differences, and the cause of these problems (the foundation systems moving differentially between the interior and exterior walls, and the cause of action the foundation movements being expansive soils). The house was built in 1961 with a shallow foundation system (as was common at the time), and the expansive soils at the Property have existed since it was built. The distress to the Property caused by the expansive soils would have been apparent when purchased by Claimants but for the fact immediately prior to the purchase Respondent had patched, covered, and painted over the distress. Because the cause of the damages was not addressed by Respondent, the damages quickly returned after Claimants purchased the Property.

Dyckman also addressed what was necessary to repair the deficiencies so that Claimants could get the Property they thought they purchased. With respect to the house foundations, the report states:

> The existing house foundations are 3.5 inches out of level, with seasonal movements causing wall cracking, door sticking, and shearing at interior to perimeter walls joints. Unfortunately, the girders run across the house, rather than front to back, making it impossible to stiffen the flooring in this direction.
> Therefore, we have recommended additional new girders be installed which are oriented from front to rear of the house to provide this stiffness, and limit interior underpinning.
>
> The existing perimeter foundations should be underpinned. . . .
>
> As discussed above, the short distance from rear foundations to interior parallel girders makes it impossible to provide additional rigidity to this sensitive area. Therefore, we have recommended new cross girders oriented in the upslope-downslope direction so that interior underpinning can be limited to
> a single row. To support these new cross girders, we anticipate that a new concrete beam will likely need to be run along the southern side wall alignment of the bedroom hallway. . . .

Ex. 24 at 1. Dyckman testified that the proposed underpinning is more likely than not to address the issues that exist at the Property. His report, after stating that the existing house floors should

be leveled (and how they should be leveled), states the following concerning drainage corrections:

> To address the flooding of the basement garage, a new back of retaining wall drain should be installed around the perimeter of the garage. The existing block retaining walls should be re-waterproofed . . . [¶] Another subsurface drainage system should be installed along the upslope (south) side of the residence and wrap around the eastern side of the bedroom wing. This line may tie into the back of retaining wall drain for discharge. . . .

> Should interior piers/pipe piles not be used, then to help maintain moisture stabilization within the crawlspace soils, we recommend that the soil surface be covered by a layer of stegowrap covered by a layer of concrete rat-proofing. . . [¶] The garage slab should be replaced wherein the automotive portion of the garage so that waters coming into the garage on the vehicle can drain out to the driveway. . . .

Ex. 24 at 2-3. Finally, with respect to retaining walls, the report states:

> The front retaining walls should be replaced with new concrete pier supported retaining walls. . . . [¶] The rear landscape walls along the eastern side of the rear patio, and across the back yard are also failing. The eastern property line wall can be replaced with a new pier supported concrete wall similar to the
> front of the house, and the rear wall across the property can be replaced with either a concrete wall or segmental block wall to reduce construction costs.

Ex. 24 at 3. The report also addresses how the repairs should be completed. *Id.* at 1-3.


### b. Jeffrey Beam

A structural investigation of the Property was completed by Jeffrey Beam of Engineering West, Inc., a licensed civil engineer and a licensed contractor. Beam testified that minimal cracks are normal in a home. The Property purchased by Respondent, however, was riddled with substantial distress (problems such as cracks) and the locations of the distress throughout the Property represent far more than an occasional crack. *See* Ex. 44. Beam testified that the conditions existed at the Property when purchased by Claimants, had been going on for a long time, and had been addressed by the prior homeowners. Each of the problems existed and were apparent when Respondent purchased the Property. However, when Claimants purchased the Property, the problems were not visible (or sufficiently apparent) to Claimants to indicate a need for investigation due to the work Respondent (and her husband) had completed on the Property. Many of the problems "fixed" by Respondent have come back during Claimants' ownership of the Property more or less as they were when Respondent purchased the Property.

The evidence shows that in January 2018, an excessive number of stucco cracks were patched, which along with the Property's other problems, shows that the Property was moving and that there was a big problem with the Property. *See* Ex. 31. Had Beam been alerted to the excessive number of cracks, he would have recommended a geotechnical expert be retained to determine the extent of the problem and what to do.

Beam testified that photographs of the presale condition of the Property show that the bottom several feet of the wall and the master bedroom at the back were discolored, molded, and rotted, which was the result of water intrusion. The new tiling in the bathroom (at the height of the concrete wall) shows that water intrusion was penetrating behind the wall and making the shower leak. This same problem was visible in the two other bedrooms.

Beam testified that the back wall of the living room was a foot lower than the hallway, and there had been significant movement of the living room in the back right corner, resulting in excessive patching. Beam testified that there was a piece of plywood with a date stamp installed in the underfloor to support the flooring of the hall and the living room at the location corresponding with the damage in the corner of the living room. Because the plywood was dated, it is clear that the piece of plywood was installed after the house was purchased by Respondent. There were problems with the stairs to the garage (described in the home inspection report as rickety and with plywood patches applied to the steps). There was evidence of water coming in through the wall, and the stairs had been removed and replaced. Portions of the garage slab had been taken out and replaced for unknown reasons. The front wall of the garage reflected water intrusion from the deck above. By opening the ceiling and looking in that area, Beam was able to determine that there was some dry-rotted framing next to some brand new pressure-treated framing that looked exactly like the material used on the repair of the stairs and that this work had been done recently. The decking outside a sliding glass door was mounded, suggesting a problem with the door leaking existed and an attempt to fix the damage caused had been made.

Beam testified that to fix the problems, the first issue to be resolved would be to underpin the foundations, to stabilize and stop further movement of the home. After the foundation work is completed, the house needs to be releveled (which would involve raising the floors and walls), and all of the work necessary to repair it after that (e.g. fixing issues with doors, cracks, replacing windows to comply with the code, leak proofing the exterior stucco on the back wall of the home) should be included. Beam worked with Rocky Rieger ("Rieger") to determine the items that needed to be addressed and left it to Rieger to prepare a bid to do the work. With respect to Mathews' proposed work (set forth below) to repair the distress to the Property, Beam notes that while the proposed drainage work is reasonable, Matthews' proposal does not address the needed releveling, housework, and cosmetic repairs, and waiting years to have this work done is not reasonable.

*c. Matheson and Rieger*

**Final Award**

Bruce Matheson ("Matheson") of Foundation Technologies, Inc., is an experienced licensed civil engineer and licensed engineering contractor. Matheson was asked to provide a proposal for the repairs recommended by Dyckman and Beam. His proposal includes the recommended drainage improvements/repairs, structural repairs to the house (releveling, support underneath the home with beams or girders), underpinning of the house (with drill piers), and repairs to the exterior of the home (including repair/replacement of the retaining walls and the removal and replacement of the concrete staircase with properly supported new reinforced concrete walls. Ex. 25. The total estimated and proposed cost of the Matheson bid is $622,165.00. *Id.* The cost is high due to the extent of necessary work to be performed on an existing structure. In his experience, using the less expensive approach of a drainage system (rather than stabilizing with underpinning) does not work (i.e., the house continues to move) or does not work anywhere near as well as underpinning.

Rieger, a licensed Class B contractor for 20-plus years, works for Main Street Builders, which focuses on residential remodels. Rieger prepared a bid to complete the recommended repairs identified by Dyckman and Beam. Ex. 26. The bid identifies six categories of work (general conditions, concrete flatwork, balcony deck repair & resurface, egress window & stucco repairs, garage repairs, interior repairs, and painting) and the cost for completion of each item within each category. *Id.* The cost for the repair work identified by Rieger is $334,129.11. *Id.* At the hearing, Claimants removed $12,000 from this estimate for charges that are duplicative of Matheson's work on the front stairs.

### c. Claimants' Additional Damages

Claimants were told by Beam that the construction needed to repair the Property would probably take six months, during which Claimants would not be able to live in the home. Claimants offered evidence regarding the costs of alternative housing (moving and storage costs, renting a home for six months) and that such costs will be $29,800. Ex. 52. In connection with resolving the problems at the Property, Claimants retained several experts, the costs paid to Dyckman, Beam, Matheson, Rieger, and Avalon to investigate and evaluate the conditions at the Property and formulate an appropriate repair plan (recoverable under *Stearman v. Centex Homes* (2000) 78 Cal.App.4th 611) are $16,659. Ex. 53. These costs do not include the amounts paid to the experts in connection with their hearing testimony.

### 2. Respondent's Expert Evidence

#### a. Patrick Shires

Respondent offered a report from Patrick Shires ("Shires"), a civil and geotechnical engineer, containing geotechnical conclusions and recommendations regarding the distress at the Property. Ex. H. In the Findings portion of the report, Shires states that: (1) a floor level survey shows that the total differential floor elevation access the residence drops 3.5 inches from the

east to the south; (2) distress to the interior of the residence (set forth on Figure 2, Interior Distress Map, attached to the report) appears to be concentrated along the southeast side of the house in all the bedrooms and bathrooms, where the floors slope down from the east to the south; and (3) with respect to exterior distress (set forth on Figure 3, Exterior Distress Map to the report), "in general, all of the exterior landscape walls show evidence of tilting and cracking." Concerning the causation of the identified distress, the Report states:

> Our geotechnical investigation revealed that the primary causes of the out-of-level floors and distress to the residence and exterior is expansion and downslope creep of surficial soils (colluvium) derived from the shallow Monterey Shale bedrock materials as well as the expansive artificial fill materials generated from grading for the foundation and retaining walls. . . . Our interpretation was formulated after comprehensive subsurface exploration, laboratory testing and analyses. . . .

Ex. H. at 5. The report next addresses mitigation measures and states that:

> There are various mitigation measures that can be undertaken to resist movement of potentially expansive earth materials with various costs associated with them.

> One method that is often employed is to attempt to isolate the foundation soils such that the moisture content remains constant through seasonal moisture changes. This method typically involves installing positive surface drainage around the residence such that surface water is directed well downslope of the residence through grading to swales and area drains away from the foundation and carrying all roof downspouts in tightline pipes well downslope of the residence, then installing a deep . . . moisture barrier . . . around the perimeter of the residence and extending the membrane out such that the foundation support is not undermined . . . and then installing a perimeter subdrain . . . Once good surface drainage is achieved and the moisture barrier and the subdrain have been installed, then the residence should be re-leveled such that sloping floors with gradients less than 1/240 are re-established and cosmetic repairs to cracks, etc. are made. The residence should then be monitored for a period of years to confirm that moisture conditions have stabilized and minor cosmetic repairs made during the stabilization period as necessary.

> For additional protection against expansive soils, another measure that can be undertaken is to underpin the residence with helical anchors or reinforced concrete underpins designed to resist expansion pressures of minimum 5,000 psf on the base of the foundation(s). Underpins should derive their support from the Monterey Formation bedrock and be embedded a minimum of 15 feet into bedrock or deeper in order to resist the potential expansion pressures. . . .

With respect to the exterior site retaining walls, . . . the walls would need to derive their support from the underlying Monterey Formation bedrock and be designed to be able to resist active earth pressures of 80 pcf, equivalent fluid.

Ex. H at 5-6. Concerning the drainage fix, Shires testified that the Property would have to be monitored over a couple of years, after which some floors would have to be releveled, and cosmetic repairs performed in the house to fix any new crack. Unlike Dyckman's proposal, there would be an adjustment period "where they'd have to do cosmetic repairs over the next few years to make sure that it's performing as it should," and there would be no guarantee of future performance of the fix. Shires and Dyckman testified that it is not more probable than not that a drainage solution is going to result in no cracking in the future. In his proposed fix was selected, Claimants would have to accept some uncertainty as to whether this solution would in fact work. Shires also testified that even with an underpinning option, there's no guarantee that it will stabilize the soil under the foundation of the house. In contrast, Dyckman testified that while a drainage solution would be better than doing nothing, the drainage solution has limitations (would improve rather than solve the problems) and the underpinning solution is the solution that has the least potential for future problems.

### b. David Matthews

David Matthews ("Matthews") is a licensed A contractor and licensed B (engineering) contractor. He is not a licensed engineer. Matthews first testified concerning Matheson's scope of repair. After noting that he did not disagree with Dyckman's conclusions on causation, he did disagree with the scope of work to repair the conditions. Matthews testified that the underpinning course of repair would be a betterment to the existing home (given that the home was not underpinned to the foundation when built) and that a curtain drain method (to keep water from getting to the expansive soil) is, in his view, a reasonable fix to solve the problem on the Property. Matthews's proposed moisture barrier repair is, following Shires recommendation, to put a drain on three sides of the house ("bringing the curtain wall around the backside of the garage to the front corner of the house, the back of the house, and then ...  the south side of the house to the front short retaining wall that's leaning out"), and the estimated cost of this repair would be between $220,666.66 and $344,000. It was not an itemized bid, and Matthews did not indicate the specific cost of the tasks included in the bid. Matthews also testified that he wait on completing the releveling to see if the curtain drain was performing properly, and the price of the releveling repairs could increase. His bid likewise does not include the cost of necessary cosmetic repairs, which he would complete after determining that the drain was performing properly.

Due to its untimely production at the arbitration hearing, Matthews' written bid was not admitted into evidence. Claimants' motion to strike Matthews' testimony regarding appropriate repairs is DENIED. The testimony was not persuasive. Claimants' motion to strike Matthews' testimony regarding "reasonable" conduct of a buyer is GRANTED.

Claimant Bernaz testified that the drainage, releveling and ultimately cosmetic repair approach proposed by Respondent's expert is not acceptable, and was in his view "it seems like a Band-Aid for a bullet wound."

### III. SUMMARY OF CLAIMS AND ISSUES

Claimant's Demand for Arbitration ("Demand") alleges Respondent failed to disclose various conditions/defects and/or concealed such conditions/defects, including: "(1) cracks in the retaining walls; (2) water coming through the walls of the garage and basement causing subsequent flooding; (3) water coming through the ceiling of the garage; (4) unpermitted work; (5) interior cracks that were patched, taped, and painted over, and (6) other foundation, drainage, and soil stability issues." Claimants further allege a failure to fully and completely disclose the remodeling Respondent completed had done to the Property. Claimants allege Respondent's liability as a developer, and that the remodeling was done below the standard of care. Claimants seek reimbursement for costs to repair and/or correct the negligent and defective reconstruction and/or remodeling as well as diminution in value. Claimants alternatively seek rescission.

### IV. DISCUSSION

"Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." Evidence Code § 500. "'Burden of proof' means the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." Evidence Code § 115. "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." *Id*. "'Preponderance of the evidence' "means what it says, viz., that the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, not necessarily in number of witnesses or quantity, but in its effect on those to whom it is addressed." *Glage v. Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 325. A party must persuade the trier of fact, by the evidence presented, "that what he or she is required to prove is more likely to be true than not true." CACI 200. If after weighing all of the evidence, the trier of fact "cannot conclude that something is more likely to be true than not true," the trier of fact "must conclude that the party did not prove it." *Id*. The trier of fact "should consider all the evidence, no matter which party produced the evidence." *Id*.

### A.    Fraudulent Concealment and/or Misrepresentation

Claimants contend that Respondent is liable to Claimants for fraudulent concealment and/misrepresentation in connection with Respondent's sale of the Property to Claimants. Respondent contends that intention concealment and misrepresentation are not viable theories of recovery against her.

"The elements of a cause of action for intentional misrepresentation are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) actual and justifiable reliance, and (5) resulting damage." *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1166. "The elements of a claim for negligent misrepresentation are nearly identical." *Id.* "Only the second element is different, requiring the absence of reasonable grounds for believing the misrepresentation to be true instead of knowledge of its falsity." *Id.*

"The elements of a cause of action for fraud based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *RSB Vineyards, LLC v. Orsi* (2017) 15 Cal.App.5th 1089, 1096-97. "Active concealment or suppression of facts by a nonfiduciary is the equivalent of a false representation, i.e., actual fraud." *Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 291 (citation and internal quotation marks omitted).

### 1. Respondent's Duty to Disclose and Intentional Concealment of Material Facts

Claimants contend that Respondent concealed or misrepresented several material adverse conditions/defects (primarily cracks, gaps, and water intrusion) at the Property in connection with her sale of the Property to Claimants. Claimants assert that: (1) the magnitude of visible conditions and defects (gaps, cracks, water intrusion) at the Property when Respondent purchased the Property were material facts indicative of soil expansion, settlement, and erosion; and (2) Respondent had a duty to make a complete disclosure of what she knew about the Property and to provide historical documents to Claimants, and Respondent failed to do so.

Respondent, while conceding that she failed to disclose certain information, contends that she had no intention to conceal any information from Claimants or misrepresent certain facts. Respondent asserts, *inter alia*, that : (1) Respondent had no knowledge regarding soil movement or water intrusion at the Property or the need for significant repairs when she purchased Property; (2) Respondent relied upon her husband to inspect the home and do what needed to be done; (3) Respondent did not perform a close inspection of the Property; and (4) Respondent did not understand the significance of the cracks at the Property or the records provided to her for the Property, and did not understand her duties in connection with her sale of the Property.

"A real estate seller has both a common law and statutory duty of disclosure." *Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 161. "In the context of a real estate transaction, it is now settled in California that where the seller knows of facts materially affecting the value or desirability of the property ... and also knows that such facts are not known to, or within the

reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer." *Shapiro v. Sutherland* (1998) 64 Cal.App 4th 1534, 1544. (citation and internal quotation marks omitted). "Undisclosed facts are material if they would have a significant and measurable effect on market value." *Shapiro*, 64 Cal.App 4th at 1544.

The obligation to disclose only arises if the defendant "had actual or constructive knowledge of the deficiencies." *RSB Vineyards*, 15 Cal.App.5th at 1097. "Actual knowledge can, and often is, shown by inference from circumstantial evidence." *Id.* at 1097–98. "[A]ctual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture." *Id.* at 1098 (citation omitted). "Only where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted." *Id.* (citation omitted). "The mere denial of knowledge, by itself, does not protect the seller from liability," and "[t]he fact that the truth is contained within the seller's records is sufficient to show that the seller either knew or must have known of the fact." 1 Cal. Real Est. § 1:158 (4th ed.)  "Where a seller fails to disclose a material fact, he may be subject to liability "for mere nondisclosure since his conduct in the transaction amounts to a representation of the nonexistence of the facts which he has failed to disclose." *Calemine*, 171 Cal.App.4th at 161 (citation omitted).

"Effective January 1, 1987, California imposed a very specific disclosure requirement upon covered residential real estate sellers." *Shapiro*, 64 Cal.App 4th at 1545. Any waiver of the disclosure requirements "is void against public policy." Civil Code § 1102(c).) The Legislature's stated purpose in enacting this change was to clarify "that the delivery of a real estate transfer disclosure statement may not be waived in an 'as is' sale." *Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 201. "The statutory language specifies the precise disclosure form to be used," i.e., the TDS disclosure form. *Id.* (citing Civil Code § 1102.6.) "With respect to the discharge of this statutory duty of disclosure, the Legislature also provided that each disclosure shall be made in 'good faith,' which was expressly defined to mean 'honesty in fact in the conduct of the transaction.'" *Id.* (citing Civil Code § 1102.7. "The specification of particular matters to be disclosed was not intended to limit or abridge any obligation for disclosure by any other provision of law which may exist to avoid fraud or deceit in the transfer transaction." *Id.* (citing Civil Code § 1102.8. With respect to a remedy for violation, the statute provides that "any person who willfully or negligently violates or fails to perform any duty prescribed by any provision of this article shall be liable in the amount of actual damages suffered by a transferee." *Id.* (citing Civil Code § 1102.13. "However, no transferor may be held liable for any error or inaccuracy or omission in a disclosure statement if such 'error, inaccuracy, or omission was not within the personal knowledge of the transferor. ., and ordinary care was exercised in obtaining and transmitting it.'" *Id.* (citing Civil Code § 1102.4(a)).

Based upon the record presented, Respondent concealed a number of material facts affecting the value or desirability of the Property from Claimants in connection with their purchase of the Property. In connection with her purchase of the Property, Respondent received (and initialed) documents (the listing agent's "Agent Detail Report" and AVID) stating that: (1)

24

**Final Award**

the home needs updates to "all major systems" and "has visible structural issues;" (2) the "walls, floors, windows, doors, ceilings and other surfaces have . . . cracks, . . . stains and other imperfections in places; (3) the wall in the living room "has major holes and what appears to be visible structural movement within;" (4) "Home appears to have visible structural issues to walls in the living room and front exterior staircase;" and (5) "all major systems of the home, including but not limited to . . . foundation, are in need of repairs or updating." She also received an AVID from her own agent stating that: (1) there were "cracks and stains on floors, walls, . . . and ceiling" in the dining room, kitchen, stairs, bedrooms, and both bathrooms; (2) there was a crack in the floor in the entry;  (3) the three bedrooms and non-master bathroom had "Gaps in corners on walls and floor;" (4) "Deck off family room and kitchen slopes down and into property and shows signs of water intrusion;" (5) for the garage,  "Large cracks and uneven flooring," "Ceiling has large holes and missing sheetrock," and "Stairs have loose treads and rot next to wall;" and (6) concerning the exterior of the Property, "Stairs show signs of movement with uneven concrete, cracks," and "a brick decorative column is lifted." These statements clearly suggest that the Property had foundation issues and was moving and that this movement was causing visible structural issues that needed repair (cracks, gaps, uneven floors, and water intrusion). The statements would have affected the value or desirability of the Property if disclosed by Respondent, and were, therefore, material facts.

While Respondent claims to have been unaware of the material facts in these statements (because she purportedly did not read the documents), the evidence established that Respondent either knew or must have known of these facts. Respondent visited the Property before her purchase and received the documents containing the statements in connection with her purchase of the Property. In an email to her agent noting her receipt of the disclosure reports (prior to her purchase of the Property, Respondent stated that she was "aware of the problems with the house." After her purchase,  Respondent visited the Property at least 20 times. During her deposition, she repeatedly denied seeing or having any knowledge of cracks and other issues at the Property. At the hearing, she ultimately admitted seeing some of the issues noted in the documents at the site prior to her sale of the Property. When she listed the Property for sale, Respondent was still in possession of the documents containing the material facts, yet she failed to acknowledge that fact in her disclosures, and subsequently failed to produce the documents in response to Claimants' request therefore during the arbitration. Given the foregoing, Respondent undoubtedly knew about material facts (i.e., statements that the Property had visible structural issues and cracks throughout the home)

In addition to her knowledge of these material facts, Respondent also knew that these facts were not known to, or within the reach of the diligent attention and observation of Claimants. The repair work to the Property during Respondent's ownership covered up the problems with the Property. Given the repair work performed, and Respondent's failure to disclose the documents containing the material facts and the photos (available when she purchased the Property) showing the material facts, Respondent deprived Claimants of the ability to see and investigate the problems identified by de Vries and Milestone. Based upon the foregoing, Respondent was under a duty to disclose to Claimants the material statements

(regarding cracks and visible structural problems) in the Agent Detail Report and the AVIDs.

The evidence was undisputed, and Respondent essentially conceded that she failed to disclose the material facts in the documents (and failed to disclose the documents as required by the SPQ) prior to her sale of the Property to Claimants. The evidence also established that Respondent made misrepresentations in her disclosures to Claimant. Respondent falsely stated in the TDS that she was unaware of alterations or repairs without necessary permits. Respondent falsely stated in the SPQ that: (1) there were no alterations, modifications, improvements, remodeling, or material repairs to the Property; (2) she was not aware of any settling from any cause, or slippage, sliding or other soil problems; (3) she was not aware of any alterations, modifications, (4) while she stated that she was aware of replacements, improvements, remodeling or material repairs on the Property for the purpose of energy or water efficiency and explained that these improvements were painting, new landscape and new driveway, she failed to mention any of the crack and gap covering in the interior of the home; and (5) perhaps most critically, she stated that she was unaware of "reports, inspections, disclosures, . . . maintenance recommendations, . . . or other documents pertaining to . . . the condition or repair of the Property or any improvement on this Property in the past, now or proposed." Nonetheless, after the commencement of the arbitration, Respondent testified that there was nothing she would change in her disclosure reports.

While Respondent claims that she had no intention to conceal any information from Claimants or misrepresent certain facts, the evidence was to the contrary. Respondent had knowledge of cracks throughout the Property, "visible structural issues," "visible structural movement," and a foundation in need of repairs or update at the Property. While Respondent covered up the visible problems at the Property, she failed to address the underlying problems and ultimately failed to disclose these facts in connection with her sale of the Property to Claimants. Given her knowledge of the problems at the Property, her decision not to conduct a further investigation because she liked the Property, and her instructions to her husband regarding necessary repairs (i.e., make it "pretty"), Respondent's statement that she relied upon her husband to inspect the home and do what needed to be done is not credible. She knew her husband's limited relevant experience in connection with the identified problems. The evidence instead indicates that Respondent relied upon her husband to cover up the visible issues at the Property. Respondent's assertions that she did not understand the significance of the cracks at the Property or the records provided to her for the Property, and did not understand her duties in connection with her sale of the Property were similarly unpersuasive. At the time of her purchase and sale of the Property, Respondent was a former real estate agent who had been involved in a number of real estate purchases. In the Arbitrator's view, the evidence and Respondent's constantly shifting testimony established that she understood both the significance of the problems identified in the disclosures and her obligation to disclose the problems to Claimants. Respondent's failure to disclose the documents and material facts therein to Claimants were intentional acts designed to conceal relevant information from Claimants and enable her to make a profit on the sale of the Property to Claimants.

Consistent with the foregoing, the Arbitrator finds that while under a duty to disclose material facts regarding the Property to Claimants, Respondent intentionally concealed the material facts set forth in the AVIDs of de Vries and Milestone and the Agent Detail Report with the intent to defraud Claimants.

## 2. Claimants' Unawareness of the Concealed Facts

Claimants contend that as a result of Respondent's nondisclosure, they were deprived of the opportunity to make a full and informed decision in connection with their purchase of the Property. Claimants contend that they took appropriate actions in response to their knowledge, i.e., their actions were reasonable in light of what they knew compared to what Respondent knew when Claimants' purchased the Property.

Respondent contends that: (1) Claimants, via the TDS and Home Inspection Report, had knowledge of numerous cracks at the home and thus had notice of foundation movement at the Property; and (2) given what they knew, Claimants were not diligent and reasonable in connection with their inspection obligations (i.e., Claimants were comparatively negligent).

As previously noted, to establish a claim for intentional misrepresentation, a claimant must establish, *inter alia*, actual and justifiable reliance, and to establish fraudulent concealment, a claimant must establish that unawareness of the material facts and that the claimant would not have acted as he/she did if he/she had known of the concealed facts. "A plaintiff establishes reliance when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." *Hoffman v. 162 N. Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1193 (citation and internal quotation marks omitted). "Although a plaintiff's negligence in failing to discover the falsity of the statement or the suppressed information is not a defense to fraud, a plaintiff's particular knowledge and experience should be considered in determining whether the reliance upon the misrepresentation or nondisclosure was justified." *Id.* at 1194. "If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable ... he will be denied a recovery." *Id.* (citation omitted). Nothing in the statutory real estate disclosure requirements "relieves a buyer or prospective buyer of the duty to exercise reasonable care to protect himself or herself, including those facts which are known to or within the diligent attention and observation of the buyer or prospective buyer." Civil Code § 2079.5.

Based upon the evidence presented and consistent with the foregoing, the Arbitrator finds that Claimants were unaware of the material facts that Respondent failed to disclose in connection with Claimants' purchase of the Property and that Claimants would not have acted as they did if they had known of the concealed facts. Respondent's argument that Claimants, via the TDS and Home Inspection Report, had knowledge of numerous cracks at the home and thus had notice of foundation movement at the Property is not supported by the evidence. Respondent's portion of the TDS did not mention

cracks. Respondent's agent's portion of the TDS mentions "cracks" in the drywall of the guest bedroom, external cracks between the concrete staircase and the home, and that the front yard retaining wall was leaning. The Home Inspection Report obtained by Claimant identified a number of "potentially significant improvements" that should be addressed at the Property, including: (1) horizontal cracking in the foundation at the rear of the crawlspace and the usual cause of this issue (how the concrete was poured); (2) substantial damage to the wood retaining wall (noting that rebuilding may be necessary in the short term), and (3) the retaining walls at the front and rear of the Property showing evidence of movement (without stating the rate at which it was moving). The TDS and Home Inspection Report identified limited problems at the Property. As noted by Claimants' experts, cracks happen at a property. Limited cracks are expected. As compared to the problems identified in the photos of the Property available when Respondent purchased the Property and the disclosures made to Respondent, the problems identified to Claimants were minimal. Respondent's nondisclosures deprived Claimants of the ability to have someone look at the history of the Property and the issues that existed when Respondent purchased the Property.

As noted above, Claimants had a duty to exercise reasonable care to protect themselves in the transaction. The weight of the evidence established that Claimants acted reasonably in response to Respondent's limited disclosures. Bernaz reviewed the disclosures that he received (unlike Respondent) and followed up with securing additional inspections. After a review of the Home Inspection Report, Claimants obtained an additional visual inspection report from Avalon. However, due to Respondent's failure to disclose the problems at the Property and her cosmetic repairs thereto, it appears that Avalon did not have the necessary information to do a proper assessment. The report prepared by Avalon did not recommend or indicate the need for further investigation of the Property, or in particular, the structural integrity of the Property, and there is no indication to anyone receiving this report that follow-up structural evaluation or soils evaluation was necessary. Without such a suggestion, Claimants had no reason to know that that additional investigative work was needed at the Property. Based upon the record presented, if Respondent had disclosed the information contained in the Agent Detail Report and de Vries AVID to Claimants in connection with Respondent's sale of the Property, it is reasonably likely that Claimants would not have purchased the Property, or that the purchase would not have been on the same terms.

Consistent with the foregoing, Claimants have established their reliance upon Respondent's fraudulent nondisclosure of material facts (of which Claimants were unaware) and Claimants would not have acted as they did if they had known of the concealed facts.

## 4. Damages Resulting from the Concealed Facts

Based upon the testimony of their experts, Claimants contend that the damages resulting from Respondent's concealment total $990,713 ($622,125 for releveling, drainage work, the front retaining wall and the front steps + $334,129.11 - $12,0000 for the remaining

recommended work [underpinning, rear retaining wall, front staircase and concrete removal and replacement] + $29,800 in moving expenses + $16,659 in *Stearman* costs).

Respondent contends that the drainage solution proposed by Shires is the better solution to rectify the problems at the Property and that Claimants are not entitled to a rebuilt foundation (as it was not contemplated when the parties entered into the transaction). Respondent did not address the moving or *Stearman* expenses sought by Claimants.

"There are two measures of damages for fraud: out-of-pocket and benefit of the bargain." *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240. "The 'out-of-pocket' measure of damages 'is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received.'" *Id.* (citation omitted). "The 'benefit-of-the-bargain' measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive." *Id.* (citation omitted). "Awarding the cost of repair effectively affords [the defrauded party] the benefit of their bargain . . ." *Fragale v. Faulkner* (2003) 110 Cal.App.4th 229, 239. However, "[i]n fraud cases involving the 'purchase, sale or exchange of property,' the Legislature has expressly provided that the "out-of-pocket" rather than the "benefit-of-the-bargain" measure of damages should apply." *Alliance Mortgage*, 10 Cal.4th at 1240-41 (citing Civil Code § 3343(a), (b)(1)).

During the hearing, the Arbitrator was informed that with respect to damages, the parties had "stipulated that [Civil Code §] 3343 and an appraisal was not required" and that the parties stipulated that "cost of repair was in fact what we were going to talk about." HT (Closing Argument) at 1371:5-8.

The expert testimony was generally in agreement that the house is significantly out of level, that the distress at the Property is caused by soil expansion, and that the Property needs to be repaired. The dispute amongst the experts was the appropriate scope of repair, and the cost thereof. Claimants are entitled to a residence and retaining walls as represented during the sale, i.e., that will perform comparable to that which would be expected of a stable older residence/property. The weight of the evidence was that the underpinning plus drainage work plus structural repair proposed by Claimants' experts is more likely than not to address the issues that exist at the Property. In contrast, the testimony established that Respondent's solution to install drainage, wait and see, and future cosmetic repair (at an unknown cost) is less than likely to address the movement/ cracking at the Property in the future. Moreover, Respondent's proposal did not address the repairs to be performed inside the house.

Respondent's recommendation falls short of a complete and final repair.

Recommending that a portion of their repair be reserved for future review creates an incomplete and unworkable resolution. In an effort to determine an award, the arbitrator would be left to speculate on the appropriate measure of damages. Evaluating a delayed repair and the length of delay cannot be reasonably incorporated into an arbitration award. Consistent with the foregoing, Claimants are entitled to recover from Respondent damages in the amount of $990,713.11 resulting from Respondent's fraudulent concealment of material facts.

## 5.   Punitive Damages

During closing argument, Claimants' counsel briefly stated that as to punitive damages to make an example of Respondent, he leaves that issue to the Arbitrator.

"Notice and an opportunity to be heard are essential ingredients to a fair hearing, and these principles apply to arbitration hearings." *Emerald Aero, LLC v. Kaplan* (2017) 9 Cal.App.5th 1125, 1142. A "party may successfully challenge an arbitration award if the relief granted was in violation of "specific restrictions" in "the rules of arbitration." *Id.* at 1140. JAMS Rule 9(a) provides that "[e]ach Party shall afford all other Parties reasonable and timely notice of its claims, affirmative defenses or counterclaims," and that "[n]o claim, remedy, counterclaim or affirmative defense will be considered by the Arbitrator in the absence of such prior notice to the other Parties, unless the Arbitrator determines that no Party has been unfairly prejudiced by such lack of formal notice or all Parties agree that such consideration is appropriate notwithstanding the lack of prior notice." Rule 9(b) states that a demand for arbitration "shall include a statement of the remedies sought." Rule 10 provides that after the appointment of the Arbitrator, "no new or different claim may be submitted, except with the Arbitrator's approval."

Claimants' Demand does not seek an award of punitive damages. Claimants' opening arbitration brief likewise did not seek an award of punitive damages. Given that Claimants failed to provide notice of their request for punitive damages until after the close of the hearing, and the unfair prejudice that would result to Respondent due to the lack of notice, Claimants' claim for punitive damages will not be considered by the Arbitrator.

## 6.   Conclusion re Claimants' Fraudulent Concealment Cause of Action

Consistent with the foregoing, the Arbitrator finds in favor of Claimants against Respondent on Claimants' fraudulent concealment claim. Claimants are entitled to recover from Respondent damages in the amount of $990,713.00 resulting from Respondent's fraudulent concealment of material facts.

## B.   Motion For Attorneys' Fees, Costs, and Interest on Amount Awarded

Claimants contend that they are entitled to attorneys' fees and costs under the terms of the Agreement and prejudgment interest pursuant to Civil Code § 3288. After the filing of the

motion, counsel for Respondent advised Claimants' counsel and the Arbitrator that Respondent would not file an opposition to the motion for attorneys' fees, costs, and interest.

## 1. **Prevailing Party**

Paragraph 22B of the Agreement is an agreement to binding arbitration of "any dispute or claim in law or equity arising between them out of this Agreement or any resulting transaction." Paragraph 25 of the Agreement states, "In any action, proceeding or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorneys' fees and costs from the non-prevailing Buyer or Seller . . ."

Consistent with the balance of this Award, Claimants are the prevailing party in the arbitration. In the Interim Award, the Arbitrator set forth a schedule for the briefing of any motion for attorneys' fees and costs to be filed by Claimants.

Claimants timely filed a motion for reasonable attorneys' fees, costs, and interest. The motion is supported by a declaration from Claimants' counsel, Mr. Hamerslough.

Mr. Hamerslough's declaration set forth: (1) his firm's bills to Claimants (which address both attorneys' fees and costs) for this matter from February 6, 2019, to March 31, 2022; (2) his communications with Respondent Lilly Vu prior to her retention of counsel, which resulted in the preparation and filing of a motion to compel the appointment of a mediator (pursuant to the Agreement); (3) his communications with Respondent's counsel related to the commencement of the arbitration; (4) his work in connection with the commencement of the arbitration; (5) the discovery process in the arbitration; (6) his preparation for the arbitration hearing (including preparation of an arbitration brief), the arbitration hearing, and his preparation for and conduct of closing argument; (5) the additional arbitration fees incurred by Claimants due to Respondent's failure to pay her share; (6) review of the Interim Award and preparation of the motion for attorneys' fees and costs; (7) the time billed (197.2 hours in attorney time and 27.7 hours in paralegal/assistant time), which totals $104,770 and Claimants' payment of his bills; (8) the rates charged by his firm; (9) the time to prepare the motion and any reply; and (10) the costs incurred by Claimants for which Claimants seek recover in this motion ($64,892.57), and Claimants' payment of those costs. Hamerslough Decl., ¶¶ 1-22 and Ex. A thereto.

## 2. **Reasonable Attorneys' Fees**

Claimants contend that they have incurred reasonable attorneys' fees in the amount of $106,270 ($104,770 through March 31, 2022 + $1,500 for the preparation of the motion for attorneys' fees, costs, and interest).

"The trial court has broad authority to determine the amount of a reasonable fee." *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095. "The fee setting inquiry in California ordinarily begins with the "lodestar," i.e., the number of hours reasonably expended multiplied

by the reasonable hourly rate." *PLCM Group*, 22 Cal.4th at 1095. "Absent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for all the hours reasonably spent, including those relating solely to the fee." *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133.

### i. Reasonable Rate

Claimant asserts that his counsel's rates are reasonable.

"The reasonable hourly rate is that prevailing in the community for *similar work*." *PLCM Group*, 22 Cal.4th at 1095 (Emphasis added). "The courts repeatedly have stated that the trial court is in the best position to value the services rendered by the attorneys in his or her courtroom, and this includes the determination of the hourly rate that will be used in the lodestar calculus." *569 East County. Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 436-437 (citations omitted). "In making its calculation, the court may rely on its own knowledge and familiarity with the legal market, as well as the experience, skill, and reputation of the attorney requesting fees, the difficulty or complexity of the litigation to which that skill was applied, and affidavits from other attorneys regarding prevailing fees in the community and rate determinations in other cases." *Id.* (citations omitted).

Based upon the Arbitrator's knowledge and familiarity with the Bay Area legal market, the experience, skill, and reputation of Claimants' counsel, the complexity of the arbitration, and the declaration of Mr. Hamerslough and the exhibits thereto, the Arbitrator finds that the hourly rates charged by Claimants' counsel ($500), his paralegal ($225) and his assistant ($100) in connection with the arbitration are reasonable and consistent with the prevailing rates for similar work in the Bay Area.

### ii. Reasonable Hours

Claimants contend that the attorneys' fees clause in the Agreement is broad enough to cover the contract and fraud claims alleged in their Demand and that the time spent by their attorney's law firm was reasonable. Claimants assert that Respondent's attitude from the outset was that the claim was without merit and forced Claimants to arbitrate this matter by failing to acknowledge any potential liability or make a settlement offer.

Again, a court or Arbitrator assessing attorney fees begins with a touchstone or "lodestar figure," which in addition to the prevailing rate, requires a determination of the reasonable hours spent by counsel on behalf of the prevailing party. The party seeking attorney's fees and costs "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1020 (citation omitted). "The evidence should allow the court to consider whether the case was overstaffed, how much time the attorneys spent on particular claims, and whether the hours were reasonably expended." *Christian Research Inst. v. Alnor* (2008) 165 Cal.App.4th 1315, 1320. "A

reduced award might be fully justified by a general observation that an attorney overlitigated a case or submitted a padded bill or that the opposing party has stated valid objections." *Gorman v. Tassajara Dev. Corp.* (2009) 178 Cal.App.4th 44, 101. The trial court makes its determination of whether the lodestar is reasonable "after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case." *PLCM Group*, 22 Cal.4th at 1096.

Claimants prevailed on their claims and obtained their arbitration objectives. Based upon a review of the record presented, the Arbitrator finds that the time spent on the case by Claimants' counsel was reasonable and necessary given the claims asserted, the issues related thereto, Respondent's defense of the arbitration, and the skill demonstrated by Claimant's counsel. Counsel adequately documented the hours expended on behalf of Claimants, and the bases for the time expended. Counsel's time records establish that the hours were reasonably expended and the case was not overstaffed or over-litigated.

### iii. Conclusion Re Reasonable Attorneys' Fees

Consistent with the foregoing, Claimants' motion to recover attorneys' fees from Respondent pursuant to the terms of the Agreement is GRANTED in the amount of $106,270.

### 3. Reasonable Costs

Claimants' motion seeks recovery of the costs paid by Claimants in connection with the arbitration in the amount of $64,892.57. The costs requested include, but are not limited to arbitration fees, court reporter costs, filing fees, photocopies, services of process fees, and deposition/document costs. Hamerslough Decl., Ex. A at 15-19.

"Allocation of costs in arbitration proceedings is governed by the parties' agreement or the rules governing the arbitration proceeding." Cal. Prac. Guide Alt. Disp. Res. Ch. 5-I, ¶ 5:434.2. "The provisions of the Code of Civil Procedure for allocation of costs of suit (CCP § 1032 et seq.) do not control arbitration awards." Cal. Prac. Guide Alt. Disp. Res. Ch. 5-I, ¶ 5:434.2 (citing *Britz, Inc. v. Alfa–Laval Food & Dairy Co.* (1995) 34 Cal.App.4th 1085, 1106 fn. 9 and *Austin v. Allstate Ins. Co.* (1993) 16 Cal.App.4th 1812, 1815).

Rule 24(g) of the JAMS Comprehensive Arbitration Rules provides that "[t]he Award of the Arbitrator may allocate attorneys' fees and expenses . . . if provided by the Parties' Agreement or allowed by applicable law." Again, the Agreement provides in pertinent part that, "In any action, proceeding or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorneys' fees and costs from the non-prevailing Buyer or Seller . . .'"

Consistent with the foregoing and the broad clause in the parties' agreement regarding costs, the categories and amounts of costs requested by Claimants are reasonable. Accordingly, Claimants are entitled to recover reasonable costs from Respondent in the amount of $64,892.57.

**4. Interest**

Claimants contend that Civil Code § 3288 provides the arbitrator with discretion to award them pre-judgment interest (at the legal rate of 7% per annum) from February 6, 2019 (the date Claimants retained Mr. Hamerslough) through the date of the Final Award and that the Arbitrator should exercise his discretion to award Claimants' pre-judgment interest.

"The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law." JAMS Rule 24(g).

Civil Code § 3288 provides that "[i[n an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." "It is clear from this language that a party does not have to prove both a breach of a noncontractual obligation *and* oppression, fraud or malice." *Bullis v. Sec. Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814 (emphasis added). "[U]nlike Civil Code section 3287, which relates to liquidated and contractual claims, section 3288 permits discretionary prejudgment interest for unliquidated tort claims." *Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, 102. "Prejudgment interest is awarded to compensate a party for the loss of the use of his or her property." *Bullis,* 21 Cal.3d at 815. "The award of such interest represents the accretion of wealth which money or particular property could have produced during a period of loss." *Greater Westchester*, 26 Cal.3d at 102-103. "Using recognized and established techniques a fact finder can usually compute with fair accuracy the interest on a specific sum of money, or on property subject to specific valuation." *Id.* at 103. "Furthermore, the date of loss of the property is usually ascertainable, thus permitting an accurate interest computation." *Id.* "The underlying theory is that an individual who must litigate to recover damages should be placed in the same position, when he recovers, as the individual who recovered the day he suffered an injury." *Altavion, Inc. v. Konica Minolta Sys. Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 69 (citations and internal quotation marks omitted). "Otherwise, the tortfeasor benefits from denying liability and continuing to litigate, while he retains the use of money to which the plaintiff is entitled, and the plaintiff is deprived of the benefit he should have derived from an immediate recovery." *Id.* (citations and internal quotation marks omitted).

Where prejudgment interest is awarded under section 3288 in order to compensate a party fully for their loss, that interest must be calculated on the entire judgment from the date of the tortious act proximately causing their damages. *Newby v. Vroman* (1992) 11 Cal.App.4th 283, 289. Where interest is awarded on tort and other noncontractual claims, the rate is 7% per annum from the date the claim arose. Cal. Prac. Guide Civ. Trials & Ev. Ch. 17-F, ¶ 17:1137 (citing Cal.

Const. Art. 15, § 1; *Children's Hosp. & Med. Ctr. v. Bonta* (2002) 97 CA4th 740, 775, and *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1585-86).

The evidence presented at the hearing established that Respondent concealed material facts from Claimants regarding the Property and that Claimants testified would have caused them to either not purchase the property or to have investigated it more thoroughly. The evidence further established that Respondent, by refusing to acknowledge any liability, by making no settlement offers, and by adopting the tone and attitude she displayed in her communications with Claimants' counsel, forced Claimants to arbitrate this matter. From the sale of the Property through the present date, Respondent has had the use of the funds that she now owes Claimants. Under these facts, Claimants are entitled to recover prejudgment interest on the damages to which Claimants are entitled ($990,713.00) for the period requested (February 6, 2019 [the date Claimants retained counsel] to the date of this award). The failure to award interest on this sum would reward Respondent's denial of liability and condone her forcing Claimants to arbitrate this matter to a conclusion. Consistent with the foregoing, Claimants are entitled to recover prejudgment interest from Respondent in the amount of $231,799.64.[1]

### 5. <u>Conclusion Re Motion For Attorneys' Fees, Costs, and Interest</u>

Consistent with the foregoing, Claimants' motion to recover attorneys' fees, costs, and interest from Respondent is GRANTED in the amount of $402,962.21 ($106,270 + $64,892.57 + $231,799.64).

### <u>V. CONCLUSION</u>

Consistent with the foregoing, the Arbitrator enters a Final Award in favor of Claimants Steven Bernaz and Christine Lee and against Respondent Lilly Vu in the amount of $1,393,676.21 ($990,713.00 + $402,963.21).

Dated: June 9, 2022

_____
Hon. Kevin E. McKenney (Ret.)
Arbitrator

---

[1] Calculating 7% interest per annum on $990,713.00 equals:
a) Annual: $69,349.91 ($990,713 x 0.07); and
b) Daily: $189.99 ($69,349.91 / 365).
There were 1,220 days between February 6, 2019, and June 9, 2022.

# EXHIBIT B

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO.: | FOR COURT USE ONLY |
|---|---|---|

NAME: David Hamerslough (SBN 95010)
FIRM NAME: Rossi, Hamerslough, Reischl & Chuck
STREET ADDRESS: 1960 The Alameda, Suite 200
CITY: San Jose STATE: CA ZIP CODE: 95126
TELEPHONE NO.: (408) 261-4252 FAX NO.: (408) 261-4292
E-MAIL ADDRESS: dave@rhrc.net
ATTORNEY FOR (name): Petitioners Steven Bernaz, Christine Le

**on 1/24/2023 11:15 AM**
**Reviewed By: R. Sandoval**
**Case #19CV358517**
**Envelope: 11004892**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS: 191 N. First Street
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Santa Clara

PLAINTIFF/PETITIONER: Steven Bernaz and Christine Lee

DEFENDANT/RESPONDENT: Lilly Vu

OTHER:

| | CASE NUMBER: |
|---|---|
| | 19CV358517 |
| | JUDICIAL OFFICER: |
| | Hon. Socrates Manoukian |

| PROPOSED ORDER (COVER SHEET) | DEPT.: 20 |
|---|---|

**NOTE:** This cover sheet is to be used to electronically file and submit to the court a proposed order. The proposed order sent electronically to the court must be in PDF format and must be attached to this cover sheet. In addition, a version of the proposed order in an editable word-processing format must be sent to the court at the same time as this cover sheet and the attached proposed order in PDF format are filed.

1. Name of the party submitting the proposed order:
   Steven Bernaz and Christine Lee

2. Title of the proposed order:
   [Proposed] Order Confirming Contractual Arbitration Award And Entry Of Judgment In Conformity Therewith

3. The proceeding to which the proposed order relates is:
   a. Description of proceeding: Petition to Confirm Contractual Arbitration Award
   b. Date and time: January 17, 2023    9:00 a.m.
   c. Place: Department 20

4. The proposed order was served on the other parties in the case.

DAVID HAMERSLOUGH
_____
(TYPE OR PRINT NAME)

▶ D. Hamerslaugh
_____
(SIGNATURE OF PARTY OR ATTORNEY)

Form Adopted for Mandatory Use
Judicial Council of California
EFS-020 [Rev. February 1, 2017]

**PROPOSED ORDER (COVER SHEET)**
**(Electronic Filing)**

Cal. Rules of Court,
rules 2.252, 3.1312
www.courts.ca.gov

| CASE NAME: | CASE NUMBER: |
|---|---|
| Bernaz, Lee v. Vu | 19CV358517 |

## PROOF OF ELECTRONIC SERVICE

### *PROPOSED ORDER*

1. I am at least 18 years old and **not a party to this action.**

   a. My residence or business address is *(specify):*
   1960 The Alameda, Suite 200
   San Jose, CA 95126

   b. My electronic service address is *(specify):*
   molly@rhrc.net

2. I electronically served the *Proposed Order (Cover Sheet)* with a proposed order in PDF format attached, and a proposed order in an editable word-processing format as follows:

   a. On *(name of person served) (If the person served is an attorney, the party or parties represented should also be stated.):*
   Michael Chinh Vu, Esq. (attorney for Respondent Lilly Vu)

   b. To *(electronic service address of person served):* michaelvu@vusalaw.com

   c. On *(date):* January 18, 2023

   ☐ Electronic service of the *Proposed Order (Cover Sheet)* with the attached proposed order in PDF format and service of the proposed order in an editable word-processing format on additional persons are described in an attachment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: January 18, 2023

MOLLY EDGAR
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

Filed

April 26, 2023

Clerk of the Court
Superior Court of CA
County of Santa Clara

19CV358517

By: tduarte

**DAVID HAMERSLOUGH (SBN 95010)**
**ROSSI, HAMERSLOUGH, REISCHL & CHUCK**
**1960 The Alameda, Suite 200**
**San Jose, CA 95126-1493**
**Tel: (408) 261-4252**
**Fax: (408) 261-4292**
**dave@rhrc.net**

Attorneys for Petitioners/Plaintiffs Steven Bernaz and Christine Lee

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| STEVEN BERNAZ and CHRISTINE LEE,<br><br>　　　　Petitioners,<br><br>　　v.<br><br>LILLY VU,<br><br>　　　　Respondent. | Case No.: 19CV358517<br><br>[PROPOSED] ORDER CONFIRMING CONTRACTUAL ARBITRATION AWARD AND ENTRY OF JUDGMENT IN CONFORMITY THEREWITH<br><br>Action Filed:　　November 12, 2019 |

With regard to Steven Bernaz and Christine Lee's Petition to Confirm Contractual Arbitration Award of the Hon. Kevin McKenney (Ret.) in the above-referenced action and in JAMS Arbitration No. 1110025227, the Court on January 13, 2023 stated the following:

> "No party has filed opposition to this petition. The petition is GRANTED in its entirety as prayed for. Counsel for petitioners is to prepare an appropriate order and judgment for execution by this Court. The document should be submitted through the clerk's e-filing queue. NO FORMAL TENTATIVE RULING."

The Court finds and orders as follows:

IT IS HEREBY ORDERED THAT:

Rossi, Hamerslough,
Reischl & Chuck
1960 The Alameda
Suite 200
San Jose, CA
95126-1493
(408) 261-4252
Fax (408) 261-4292

[PROPOSED] ORDER CONFIRMING CONTRACTUAL ARBITRATION AWARD AND ENTRY OF　1
JUDGMENT IN CONFORMITY THEREWITH

1      1.     The Final Award of arbitrator Hon. Kevin McKenney (Ret.) signed on June 9,

2    2022 and served on Petitioners and Respondent on June 20, 2022 is confirmed;

3      2.     Judgment in the amount of $1,394,496.85 is entered. The form of judgment

4    attached to the Petition as Attachment 10(g) is approved with the addition of the fees and costs

5    being added to the total judgment based on the Court's order set forth in ¶ 3 below. A copy of

6    the judgment is attached to this Proposed Order as Exhibit A; and

7      3.     Petitioners are awarded attorneys' fees in the sum of $750.00 (representing 1.5

8    hours of time spent preparing the petition and supporting paperwork) and costs in the sum of

9    $71.64 for the filing of this Petition. Fees and costs are awarded pursuant to the purchase

10   contract between the parties as well as based upon statutory authority.

11

12                                    **ORDER**

13   **IT IS SO ORDERED.**

                                    Signed: 4/24/2023 01:10 PM
14
15   Date:    24 April 2023          By:    Socrates Peter Manoukian
                                            JUDGE OF THE SUPERIOR COURT
16

17

18

19

20

21

22

23

24

Rossi, Hamerslough,
Reischl & Chuck
1960 The Alameda
Suite 200
San Jose, CA
95126-1493
(408) 261-4252
Fax (408) 261-4292

25

26

27

28

[PROPOSED] ORDER CONFIRMING CONTRACTUAL ARBITRATION AWARD AND ENTRY OF     2
JUDGMENT IN CONFORMITY THEREWITH

**EXHIBIT A**

1  **DAVID HAMERSLOUGH (SBN 95010)**
   **ROSSI, HAMERSLOUGH, REISCHL & CHUCK**
2  **1960 The Alameda, Suite 200**
   **San Jose, CA  95126-1493**
3  **Tel:  (408) 261-4252**
   **Fax:  (408) 261-4292**
4  dave@rhrc.net

5  Attorneys for Petitioners/Plaintiffs Steven Bernaz and Christine Lee

6

7

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       FOR THE COUNTY OF SANTA CLARA

10

11

12  STEVEN BERNAZ and CHRISTINE LEE,   | Case No.:  19CV358517

13              Petitioners,            | **JUDGMENT**

14       v.                            | Action Filed:      November 12, 2019

15  LILLY VU,

16              Respondent.

17

18        **IT IS HEREBY ADJUDGED, ORDERED AND DECREED,** upon good cause

19  appearing, that Judgment is hereby entered in favor of Petitioners Steven Bernaz and Christine

20  Lee against Respondent Lilly Vu as follows:

21        1.      For damages in the amount of $990,713.00;

22        2.      For contractual attorneys' fees incurred in the amount of $106,270;

23        3.      For costs in the amount of $64,892.57;

24        4.      For prejudgment interest from Respondent in the amount of $231,799.64;

25        5.      Attorneys' fees in the sum of $750.00 and costs in the sum of $71.64 for the

26  Petition to confirm the Final Award of the arbitrator;

27

28
    _____
    JUDGMENT

Rossi, Hamerslough,
Reischl & Chuck
1960 The Alameda
Suite 200
San Jose, CA
95126-1493
(408) 261-4252
Fax (408) 261-4292

1        6.      The total judgment is in the amount of $1,394,496.85.

2

3

4 Date: _____ By: _____

5                                                   JUDGE OF THE SUPERIOR COURT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JUDGMENT

Rossi, Hamenlough,
Rossi, Hamenlough,
Reischl & Chuck
1960 The Alameda
Suite 200
San Jose, CA
95126-1493
(408) 261-4252
Fax (408) 261-4292